| | | |
|---|---|---|
| DAVID ICKE, | ) | |
| BRIDGE OF LOVE, UK, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| | ) | Case No. 4:06CV00685 ERW |
| | ) | |
| ROYAL ADAMS, an individual; BRIDGE | ) | |
| OF LOVE, a registered fictitious name; and | ) | |
| ROYAL PERSONNEL, INC., a Missouri | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM, OPINION AND ORDER

This matter comes before the Court on Plaintiffs' Application for a Temporary Restraining

Order and Order to Show Cause Re: Preliminary Injunction [doc. #10]. A hearing was conducted

on December 7, 8, and 12, 2006. Final Post-Trial Brief was filed March 27, 2007.

## I. STATEMENT OF FACTS

Plaintiff David Icke ("Icke") is a resident of the United Kingdom. Defendant Royal

Adams ("Adams") is a resident of the State of Missouri.

Icke began his writing career in the early 1990's and published his first book in 1994. He

has written approximately 16 books, notable among them are:

1. *Alice in Wonderland and The World Trade Center Disaster* (United States copyright
issued May 1, 2006) (Pl. Ex. No. 1);

*2. And The Truth Shall Set You Free* ( 21st Century Edition) (United States copyright
issued May 1, 2006 ) (Pl. Ex. No. 2);

3. *The Biggest Secret* (United States copyright issued May 1, 2006*)* (Pl. Ex. No. 3);

4. *Children of The Matrix* (United States copyright issued May 1, 2006) (Pl. Ex. No. 4);

5. *Tales From The Time Loop* (United States copyright issued May 1, 2006) (Pl. Ex. No. 5);

6 . *Infinite Love Is The Only Truth Everything Else Is Illusion* (United States copyright issued May 1, 2006) (Pl. Ex. No. 6);

7. *I Am Me , I Am Free*;

8. *The Truth Shall Set You Free - Second Edition.*

An individual unique ISBN[1] number is assigned to each book title in England. Each book described above has been printed and distributed in the United States. *And The Truth Shall Set You Free* and *I Am Me, I Am Free* were originally printed in England.

Icke's writing was influenced in the early 1990's by his analysis of World events from the perspective of questioning whether the public is truthfully informed, based on reliable information, or if, in fact, other known information exists which is not publicly shared. After conducting research in forty countries, he wrote his first book, *R Rebellion,* and thereafter self- published. He interrupted his formal education to be a professional soccer player; a professional experience terminated because of a diagnosis of Rheumatoid Arthritis. He became a journalist with local newspapers, then went to radio and eventually joined the British Broadcasting Company as a national news presenter, then as a sports' anchor. He later became involved with the British Green Party because of his environmental concerns in the mid-1980's. Concluding that the media reported a very superficial view of the World, he investigated what was behind the news to see if what was being reported was really happening in the World, and if the "people who were behind those events were actually truly those people." (Tr. Vol. I p. 18, l. 3-4).

Icke lives at 185a High Street, Ryde, Isle of Wight, in England. He is a prodigious author and publisher whose works have international acclaim. He regularly works daily from 6:00 a.m.

---

[1] The ISBN no. is a bar code affixed to each book.

until 6:00 p.m., sometimes working seven days each week. No other person contributes any research or writing to any of his written material. He has never made any assignments of any of his work to any other person. He views his books as his children. He designs all of the covers for his books. When he began writing in the early 1990's, his books were published by various publishers until 1994, when he created Bridge of Love - United Kingdom with Linda Atherton who still operates that company, today. He has published all of his books since 1994. Of the fifteen books he has authored and published, those listed above are involved in this litigation. Icke has never transferred any interest in any copyright to anyone.

Icke self-publishes all of his works. He described this process during the preliminary hearing:

> Well, I come up with the original idea. I write the books, and that in normal circumstances is the end of the journey for the author. It's then passed on to the publisher who does all the rest. In terms of myself, I do all the rest. I write the book. I research the book. I have it proofread, and I pay for that. I have it designed, and I pay for that; all in England. I put all the pictures together. I get the artwork together. I often even come up with the cover designs, and I do everything that involves putting the book together on the final disk which is sent by my book designer, Samantha Masters in Cambridge, England, to the printer and they then print the book.

(Tr. Vol. I p. 30, l. 2-13). He has never granted publishing rights to anyone, including Adams. He has never told Adams that he has any rights as a publisher. In the United Kingdom, he hires proofreaders and artists for illustrations for all of his books, but other than those individuals, no one contributes in any way to the production of his books. He has never hired anyone in the United States to do any of this work.

Icke describes his unique writing style by saying:

> I set out in the early 1990s to find out whether the world, as we were told it was operating, was true or whether there were other forces that were manipulating events that the public didn't know about. And I started on a journey of immense research, which I funded myself, which involved traveling to more than 40 countries, meeting enormous amounts of people, reading reams of documents,

ancient accounts, people who had knowledge of the subject that I was talking about and researching.

 (Tr. Vol. I p. 15, l. 14-22)

On a book promotion trip in Sedona, Arizona in 1998, Adams, representing himself to be a wealthy individual, "a millionaire" according to Adams, approached Icke after hearing Icke speak at a conference, and volunteered to arrange for printing and distributing of all of Icke's books in the United States free gratis, because, as Adams expressed, he was so impressed with Icke's messages in his books. Icke was unwilling to allow Adams to make such efforts on his behalf without compensation, and agreed to pay Adams twenty-five percent (25%) of net profits after payment of all costs on sales of Icke's books sold through Icke's organization called Bridge of Love.[2] When Icke expanded his business in the United States, he arranged the use of the name Bridge of Love, USA for his works in the United States at an address in Arizona, designated by Icke. Icke agreed that Adams could use the name Bridge of Love, USA as a continuation of the company Icke had originated. Adams used the name, Bridge of Love, in his contacts with the consent of Icke. There was no formal business entity created in any state for Bridge of Love, USA. Adams' sole role was to arrange for the printing of a sufficient number of Icke's books to meet demands of all United States' distributors. Adams agreed to fund the printing of the first three books, *And The Truth Shall Set You Free; I Am Me, I Am Free*; and *The Biggest Secret*. Adams made telephone calls to locate potential printers and distributors in the United States upon consent of Icke. Soon after arranging for printing of three books, Adams told Icke that one of his enterprises had been shut-down by the Federal Bureau of Investigation, and he needed money,

---

[2] Icke began publishing through Bridge of Love with his former wife, Linda Atherton, mother of his children, before Icke met Adams. She continued to operate that company called Bridge of Love UK at the time of the hearing.

immediately. Icke agreed to forgo receipt of his seventy-five percent (75%) share on a temporary basis, until Adams got all of his money back for printing the first three books, and in order to build a relationship of trust with Adams. There was never a written agreement between Icke and Adams. Icke testified that "it was done on a hand shake and it was done on trust." (Tr. Vol. I p. 33, l. 13-14).

After a year or two, Adams continually represented to Icke that the "company" was struggling to meet printing costs and that Adams was keeping the company going on his "card." Rather than selling books through overseas distributors that had approached Icke, Icke elected to sell his books for foreign distribution through the Bridge of Love, USA to generate more revenue. Icke inquired of Adams about revenue being generated on foreign sales. Adams responded that such sales were "minimal." Icke later discovered that Louise Courteau, a French publisher, from 2001 until June 2006, had been sending Adams money for publishing *The Biggest Secret* and *Children of the Matrix* in France. Icke also learned that Adams claimed to be holding $10,000.00 in a trust account that was accumulated from foreign sales.

Adams first engaged Bertelsmann as a printer for Icke's books. Then, Patterson Printing was later engaged by Adams as a printer, and currently is printing Icke's books. His books were printed in Great Britain until the late 1990's, until a decision was made to print the books in the United Sates for economic reasons. Some books were then shipped back to Great Britain to Linda Atherton for distribution through Bridge of Love, UK.[3] She would then send a check to

---

[3] Bridge of Love, UK is a totally separate entity which provides Icke with no income, but does provide Linda Atherton and Icke's two children with income. Icke was married to Ms. Atherton for 29 years. Until recently, Adams has made no claims to anything from Bridge of Love, UK. At some point, it was agreed between Icke and Adams that Patterson Printing would be printing some books for distribution in the United Kingdom. Such sales would go through Bridge of Love, USA, by privilege of Bridge of Love, UK. Adams was to receive his customary 25% share of profits for books sold in the United Kingdom through Bridge of Love, USA. The

Adams "to buy them upfront and in full from the printer . . . . Linda Atherton was very surprised that Mr. Adams insisted that these checks were made out to him personally and not to Bridge of Love, and it was a constant source of bewilderment to her. And only when this was challenged, when we started looking into the financial background of what was happening in America did it suddenly become okay for Mr. Adams to have these checks paid out to Bridge of Love, USA." (Tr. Vol. I p. 43, l. 22 - p. 44, l. 4)

In the writing and publishing of his books, Icke oversaw everything up to the final disc being created. Linda Atherton would provide the ISBN number. Samantha Masters in Cambridge would put it all together and ship it to Patterson Printing where that company would use the disc to print the book. Patterson Printing would then run a proof-copy of the book, complete with the art work, and send it to Icke for review. Icke would then give final approval for printing. Adams had no input into the production of a book. (Pl. Ex. No.8). Adams had no involvement in the content of Icke's books:

> Q. Now that's not true, is it? You had absolutely no involvement in the books themselves in terms of the content.
> A. That's true.

(Tr. Vol. III p. 413, l. 11-13).

A Florida company named Bookworld was identified by Adams as a possible distributor for Icke's books. Icke approved Bookworld as a distributor. Bookworld, after collecting the income from the sale of books in the United States, first took their percentage of sales for distribution charges, then, according to Icke, paid the remainder to Adams "whose role was to

---

Bridge of Love, UK account has always been maintained separately.

pay the printer to replace the books that had been sold and to split the rest of the revenue; 75% to me [Icke] and 25% to him [Adams]." (Tr. Vol. I p. 50, l. 9-11).

A substantial amount of money collected from Bookworld, 75% of which Icke was entitled to receive, was never paid by Adams to Icke. Icke continued to see widespread interest in his books in the United States, and internationally, but no corresponding receipt of money from Adams was forthcoming. Adams told Icke that unless he wrote another book in 2005, they would be out of business by the Spring of 2006. Icke expressed astonishment! Adams responded that there were a lot of expenses which reduced profits. After Linda Albertson, who had skills as a bookkeeper, expressed concern to Icke over accounting practices represented to Icke, Patterson Printing and Bookworld personnel were contacted in order to get accurate records on the number of Icke's books[4] distributed. Distribution records for the first ten months of 2005 were acquired and reviewed. Mike Wedlock, an accountant hired by Icke, reported that books had been distributed for which no accounting had been made by Adams to Icke. Icke sent an e-mail message to Adams dated October 26, 2005, regarding the lack of revenue being received by Icke in relation to known interest in sales of his books. Adams' explanation in an e-mail transmission,[5]

---

[4]The Parties stipulated as to the prices for which each of the Icke books is currently selling:

1.  *Alice In Wonderland and the World Trade Center Disaster* - - at Borders - - $29.95;
2.  *Tales From The Time Loop* - - at Borders - - $29.95;
3.  *And The Truth Shall Set You Free* - - at Borders - - $29.95;
4.  *Children of the Matrix* - - at Borders - - 29.95;
5.  *Infinite Love is the Only Truth; Everything Else is Illusion* - - at Borders - - $24.95;
6.  *The Biggest Secret* - - at Borders - - $29.95.

(Tr. Vol III p. 325, l. 4 - p. 326, l. 1).

[5] Adams' e-mail address to which Icke responded was <RAdams1825>.

after being confronted with a representation that many books were being printed by Bookworld but little revenue was being received, was that a creditor of Bookworld had gone insolvent and Bookworld was using the authors' money to pay for capital improvements. (Pl. Ex. No. 9).

When Icke's accountant attempted to get more information from Patterson Printing, he was told by Patterson Printing that financial information would not be supplied without Adams' consent. In an e-mail message dated November 16, 2005, from Adams to Icke, he informed Icke that Patterson Printing had informed him that Icke wanted financial information, "[t]hey told me that by law, they have to send this to me, as I am the publisher, and then I can send this off to you. This is news to me. I don't understand that . . ." (Pl. Ex. No. 11). On November 16, 2005, in an e-mail exchange, Icke states, "Royal ... I am not happy at all with this business over Pattersons. What do they mean they have to send them by law only to the publisher? I thought that's what I was?" Adams states, "your [sic] the author my friend, I am the publisher but I can get all of that any way. Like I said, I need it al [sic] for taxes any ways." (Pl. Ex. No. 12). Icke never told Adams that he was the publisher, nor did he ever ask him to act as publisher. As the evidence progressed at the hearing, it became obvious that Adams claimed for himself an expanded role in Icke's affairs, all without Icke's knowledge or permission. Icke never discussed with Adams Icke's approval of giving Adams more authority on behalf of Icke, and it is very clear, that as Icke learned of the unauthorized attempts of Adams to claim more control over Icke and his works, Icke expressed disapproval of Adams' unilateral actions.

The e-mail exchange continued on November 16, 2005. Icke first writes to Adams, "[s]o what am I to Bridge of Love USA then? Just an author? Adams responds, "Bol is a sole proprietor. This way we didn't have to deal with stock and all of the complex issues. But David,

if something should happen, like I die, you get ALL the assets.  I wanted to leave a piece for Caily

[Adams' daughter] but knew you would take care of her.  You are the sole beneficiary.  Not even

Pam any more, as you asked me to take her off and I did. . . " (Pl. Ex. No.13).  Icke testified that

he was "staggered' when he learned that Adams was operating an entity in the United States

under the name Bridge of Love as a sole proprietor.  He described himself as being in utter shock

and as feeling incredibly abused.  He thought control of his books was being taken from him. Icke

had "absolutely" not given Adams the authority Adams was claiming.  Icke had communicated

with Bookworld personnel for years.  When Icke had conversations with Ron Smith, Chairman of

Bookworld, during the time frame of these e-mails between Icke and Adams, Icke began to get e-

mails threatening him with legal action from Adams if Icke did not stop talking to individuals at

Bookworld.  From that time on, until this Court's order of June 9, 2006, Icke received no more

accounting information or figures from Bookworld.

In an e-mail dated November 17, 2005, Adams tells Icke that Adams is paying himself

$2,500.00 each month, and sometimes $2,000.00 each month.  That turns out to be a false

representation.  Adams also states that there is $10,000.00 in a trust account from foreign sales,

calling the sum a minimal amount.  Icke does not regard that sum as "minimal."  (Pl. Ex. No.14).

Icke never took any action to set up a trust and has no idea if there are moneys in that trust.

Adams also represents in that e-mail message that he paid the Internal Revenue Service $5,000.00

for estimated 2005 taxes and $6,500.00 for 2004 taxes.  When Icke saw these figures, he was

"taken back," and began to understand what the accountant, Mike Wedlock, was saying about

Adams not accounting to Icke for revenue generated from the sale of books.

From time to time, Icke arranged to speak internationally, and never agreed that anyone

would receive any proceeds from engagements Icke arranged.  Icke did tell Adams that Adams

would receive 25% of profits on speaking events that Adams organized and in which he had involvement. Adams arranged one unsuccessful seminar which lost $12,500.

Adams repeatedly told Icke that if he did not produce another book, there would be serious consequences. Plaintiffs' Exhibit No. 10 dated May 11, 2005, is an example.

"MARK MY WORDS, IF WE KEEP THIS UP, AND WE DON'T HAVE A BOOK BY SUMMER, WE ARE GOING TO Have to make DRASTIC CHANGES."[6]

On January 26, 2006, Icke confronts Adams about prior representations made by Adams. Icke states that Adams had represented that they would be out of business by spring, that his life's work was in danger and he and his family were faced with being out in the street. Icke tells Adams that within a short time after Icke contacted Patterson's and Bookworld, "suddenly everything was wonderful, I got more than twice the monthly income one month and I was told that we are about to 'take off big.'". . . Icke then inquires as to the need for Adams to hire a tax attorney, and states he knows nothing about an Internal Revenue Service investigation. He asks Adams why only in the last three months Icke learned that he was not the owner of Bridge of Love USA and that Adams claimed to be the owner and Icke was only the author. Icke states he was shocked to learn this and that Adams had never told him this before. Adams responds that this had nothing to do with the partnership and it was set up as a company structure for tax purposes. Icke testified that Bridge of Love USA was a name he used before Adams came on the scene. (Tr. Vol. I p. 82, l. 19-21). Icke inquired about the foreign sales of his books, that this had not previously been mentioned, and until he inquired at Bookworld, Icke had no idea what the situation was. Adams responded that foreign sales were minimal. Icke tells Adams that after

---

[6] According to Icke, Adams frequently used upper case letters.

checking with Bookworld, 28,723 books were missing worth $77,803.00. Adams accounts this to a mistake by Icke's accountant. Icke then tells Adams that he wants the business to be run from England where he will have better control. (Pl. Ex. No. 15).

Icke is specific as to the formation of the business relationship with Adams. Icke confirms that he and Adams "formed a loose agreement. In terms of the word 'partnership,' you know, it's a partnership in the sense of a loose form of the word. But in terms of a - - a partnership in which he would have any controlling interest, it was a 75/25 percent split of profits. That was the agreement." (Tr. Vol. I p. 83, l. 3-9). At the hearing, Icke was asked to be more specific about the terms of any agreement with Adams.

> Q. Did you ever actually form a partnership, a legal entity that was a partnership of the parties?
> A. No, because it was a hand shake agreement that we would split the profits. That was my understanding of it.
> Q. My question to you is: Was it ever your intention and did you ever tell him that he was going to become your partner or were you just hiring him as an agent?
> A. He was going to fulfill a role within my work in America, and it was not my intention that he become a business entity with me in the sense of a corporation.
> Q. You were hiring him for a particular purpose, correct?
> A. It was an agreement where he performed a role and I performed a role, and it together was designed for my books to circulate in the United States through Bridge of Love, USA.
> Q. Was it ever your intention or did you ever represent to him that you were creating the works for his benefit?
> A. No. My name is David Icke, not Santa Claus. I mean that would be utterly ridiculous.
> Q. And you were never employed by Royal Personnel, correct?
> A. Absolutely correct.
> Q. And you've never signed any kind of an agreement giving your interest in your books to any entity, such as Royal Personnel, or to any person, such as Royal Adams?
> A. They're my children. I create them. I own them and would never do that.
> Q. Okay.

(Tr. Vol. I p. 83, 11 - p. 84, l. 11).

Plaintiffs' Exhibit No. 16 is an e-mail from Adams to Icke dated February 9, 2006 .

Adams makes statements about financial issues, then states, "[w]hat you are feeling for America is completely against what I am being told by my angels.  In fact the opposite, that America will be the light of the rest of the world, for world peace and I am told, it has to be this way, it is the divine plan.  Time will tell, wont [sic] it my friend oor [sic] maybe ex friend . . ."  He concludes, "I will take a few days and just think about all of this and see just how I can turn this into a miracle for all involved.  If that means my leaving, then that will be the case.  I am not sure I even want a penny anymore.  This is all so stupid."  This was sent before Icke learned of the unauthorized investment losses incurred by Adams.  Icke was concerned about Adams' reliance on the advice of angels.  Icke described the situation as follows:

> A.    Well, what happened at a certain point is that Royal Adams began to tell me that he was communicating with what he called "angels" and that they were guiding him on how to, among other things, run Bridge of Love. This was something that took me back. I mean I'm very much into the – the esoteric and that information and looking at different versions of reality.  But to be told that my life's work was now being affected by what angels told Royal Adams was quite a mind concentrator. What I did was I would reply and ask him what the angels said and all the rest of it so I could try to get some fix on what was going on.
>
> Q.    Were you concerned about this, these comments regarding the angels?
>
> A.    Yes, because as time passed, they became more and more dominant; the angels, the angels, the angels. And I'm sitting back in the United Kingdom with my family depending on me for their livelihood. I have a life's work which I have put every ounce of my being into over 20 years, and I'm hearing that communications with angels are now having an effect on what happens and what doesn't happen in terms of my work in Bridge of Love. I think anyone would be concerned.
>
> Q.    Okay.

(Tr. Vol. I p. 85, l. 22 - p. 86, l. 18).

On February 11, 2006, Adams sent an e-mail message to Icke.  As it can best be reproduced from a poor copy, in its entirety, it reads as follows:

> My friend, You have no idea as to the work I do, with the angels to make sure this is not going to happen, as you see.  So do I but the work done hand in hand with you, to stop. them.

David I work with the angels and they are now coming to me in the physical, in physical bodies. So much I would love to tell you but haven't felt close enough to you, to trust that you would not feel I am out of my cotton pickin mind. I also dont know how to explain things like the OUT of BODY that I do, etc. But I do know, my hear is here, this year to experience the full mind of God. I know 6 of my past lives, the veils are almost gone. I have been given 42 months and have promised to be ready in 24 months. I have been asked to do much for our work, the calls and work with protective energy to prepare us for what is to come and to protect us for what has tried to come. I have been doing so .....

You yet have no idea as to what BOL is and when you do, you will smile for days.

Are you finally understanding about the money. Are you finally seeing that someone is putting shit in your head and if I prove to you all that I say I will prove to you, like in the second to the last email., are you finally there and understanding?????

Or do we continue with the dissolution. I will not work in mistrust energy.

I have joined with the most incredible gal, she hears and sees as I do. I am off to see her for Valentine's Day. She see and speaks to those that have passed on to. I have never seen or heard anyone on this planet like her. I have been suggesting we work together with all of the energy work I do for BOL and we were to start today. You have no idea as to the hours and hours of work I am asked to do, the visuals I am asked to hold on to.

At any rate, I will get the papers to you as soon as he can.

Love,
Royal

(Pl. Ex. No. 17).

The next e-mail message from Adams to Icke is dated February 18, 2006. In its entirety it reads:

TELL ME MY FRIEND,

WHO DO YOU THINK YOU ARE. (I MEAN WHAT ARE YOU?) DO YOU KNOW? DO YOU WANT TO KNOW? ARE YOU READY TO KNOW?? MAYBE IT IS TIME I EMAIL TO YOU, MAYBE 200 HOURS OF VISITS INTO ONE EMAIL AND LET YOU KNOW WHY THIS IS HAPPENING..........WATCH OUT SINISTER FORCE.....ARE YOU READY TO BE CHARGED AND ELECTRIFIED? LOL AND MAYBE YOU ALREADY KNOW, SO BEGIN I ASK

WHO ARE YOU.......

SMILES,
ROYAL

(Pl. Ex. No. 18).

After receipt of this e-mail message, Icke became more concerned about "what was happening to my life's work in this country." (Tr. Vol. I p. 90, l. 4-6).

Adams rhetoric turned much more threatening in an e-mail message dated March 9, 2006.

To answer your question David and you will be notified by my attorney soon. I am Bridge of Love, solely and 100% in the united states, licensed state and federally. Therefore protected by law. Therefore the contract is made between BW and BOL. I can have anyone sign on behalf of Bridge of Love, even the president of the united states and he is not liable, nor is the contract binding to him, on the stock holder and I am 100% stock holder.

BW cant [sic] by law, make any changes without my OK.

My attorney has instructed as to course of action and asks that I follow his guidelines.

He asked for me to stop the checks. You deserve royalties which he says can even be paid annually and as we have no contract, the royalties should be adjusted.

Next, after a few days, I am to close down the web site and not send any more books to the UK.

Next, I wont [sic] even bother telling you..

14

All of this he says, is to let you to come to the table or we go to court and you can not win, in court. And, we are not in a hurry he says. My attorneys have thoroughly investigated all avenues and this is how he advised me. He has a copy of all of the contracts. All of them.

If you dont want to negotiate, that is your choice.

Bridge of love is in the process of blanketing many authors. I am taking in my fourth now.

Royal

(Pl. Ex. No. 19).

Payment was stopped on Icke's March 2006 Royalty check by Adams. The last check he received was for February 2006. Icke has received no royalties since February, 2006.

The next e-mail demonstrated an exchange concerning the parties' understanding of the agreement, or lack thereof, on March 17, 2006.

Subject: From David Icke

Hello Lisa ... thank-you for the email.

Here is an email exchange with Mr. Adams, in which you will see that he clearly agrees that he took the 75%-25% agreement and put it all in his name ... 'to protect me'. Funny thing is, I was never told about this and found out by accident in October.

I will have one last try to reach an agreement with him today before we finally have to take the legal route.

best wishes,
David
------------------
We are not refusing to do this and actually plan on it. I am just not wanting to deal with you. I have nothing to hide David, never did. It is the fact that you fell I do that just stuns me. I am not sure I want to be part of this any more. It is you going behind my back and doing all that you have done and said that has made me take this course of action. Asking to just walk away after all I have been through with you. Being unappreciative, as you are. Actually right now, I dont even see why I should enter into an agreement with you. We have no agreement, as you canceled the verbal, therefore I dont need to pay you those outrageous monies any

more, nor is there a time period to do so, just sometime this year, I am told.  Tell me, what have I got to gain....nothing.

------------------

Royal .. I have not cancelled the verbal agreement and you know that.  It is the last thing I would do.

This problem came about because without telling me you put a 75%-25% agreement and my life's work into your name.  That was outrageous and illegal and reveals a level of integrity, or lack of it, that beggars belief.

Look at yourself, Royal Adams, before you start handing it out.  If you had stuck with the 75%-25% then none of this would have come about.  You say you have nothing to hide, fine.
But don't think you can steal the rights to a man's life's work, that you have not written or researched a word of, and then expect to be trusted.  What you did was absolutely despicable in anyone's language.

I trusted you for years and then you sign everything over to yourself and expect to continue be trusted.  Unbelievable.

All I did was ask Bookworld if what you said was true that you had renegotiated the agreement in your name without consulting me, the 75% of this arrangement.  They told me that was not true, the original one stands, so it's a good job I asked and I had a right to ask.

(Pl. Ex. No. 20).

Icke made a decision to terminate his relationship with Adams.

Q.      Okay. Did there come a time after this series of events that you have testified regarding this morning that you made a decision to terminate the business relationship or verbal agreement that you had with Mr. Adams?
A.      Correct.
Q.      And when did you make that decision to terminate?
A.      Well, I was making it in my mind through March, and I made it in April, 2006.
Q.      And what -- what prompted your decision to terminate the verbal agreement?
A.      Many things. First of all, I realized from Mike Wedlock's accounting that I was not being paid anything like 75 percent of profits; that this man was now claiming control of my books; that he had stopped paying me any royalties for my books and indicated that he would only consider doing so if I signed over my future works to him, and an impossibility in any rational exchange when the goal posts were moving by the e-mail. So I had a choice which was to accept this staggering, staggering injustice which cut me to the core or to go down the legal route to regain control of my works, something I desperately did not want to do because of the financial implications and the limited funds that I had.

(Tr. Vol. I p. 101, l. 11 - p. 102, l. 7).

Icke's attorneys sent a notice to Adams terminating the agreement on April 10, 2006, and demanding, along with many other requests, that Adams cease all activities related to printing, distributing and sale of Icke's works or other products containing or incorporating the works and confirming cessation in writing to Icke's New York counsel. (Pl. Ex. No. 21).

After this Court entered its original restraining order, Icke received what he considered were threats from Adams of a different nature than those in the past. Icke's belief is that these e-mails were from Adams. Adams denies they were sent from his computer. These messages were signed "Emanual jarrell" and sent from a "Kooleaide" e-mail address. Adams denies writing the Emanual jarrell's "Kooleaide" e-mail messages to Icke. He thinks it could be traced, but has taken no action to do so. They are considered by the Court as having limited weight.

> A. I had no correspondence with him but he had correspondence with me on one occasion.
> Q. When was that?
> A. I think this was -- I was traveling at the time. I think this was around June/July of this year, 2006.
> Q. And what was the nature of that correspondence?
> A. What had happened was we then -- There was a gap of time after the original hearing to the signing of the Judge's order. And when that happened, it could have been within 24 hours, certainly within 48, I received abusive and threatening e-mail which indicated that an eye for an eye, a tooth for a tooth. And the sender of the e-mail, who called himself "Emanuel jarrell" -- with a lower case "j" -- pledged himself to destroy my business in retaliation for something I had apparently done. I also indicated on my website that I was coming to visit the United States. And when that happened, I started getting other e-mails which went to other places which said that I was a terrorist; that I was hiding Osama bin Laden and that I should be stopped on the border when I arrived and put into Guantanamo Bay or "Camp X-ray" I think was the term used. And I put these on my website to let visitors to my work see what was happening. And I received an e-mail from Royal Adams at this time saying that he had been told about what was on my website; that the -- he had been surprised to find that the e-mail that I put on the website came from his e-mail address, although not from his computer.
> Q. And that e-mail address was what? The "kooleaide" e-mail address?
> A. That "kooleaide."

MS. WYMORE: At this time, Your Honor, I'd like to introduce Plaintiffs' Exhibit which is an e-mail directed to the "bridgeoflove.co.uk" from Emanuel jarrell from the e-mail address "kooleaide@hotmail.com." May I approach the witness, Your Honor?

THE COURT: Yes.

Q.      (By Ms. Wymore) Can you identify this e-mail, Mr. Icke?

A.      Yes. It was sent to my office e-mail address for the Bridge of Love, UK, on June the 12th of 2006.

Q.      And this e-mail refers to a URL address on the World Wide Web of "davidickegreedybastard.bravehost.com." Have you ever seen that site?

A.      It was a website that, to my knowledge, suddenly appeared. I certainly had not heard or seen anything of it until I received this e-mail which was depicting me, shall we say, in less than complimentary terms, including the fact that I was a, quote, "greedy bastard."

Q.      And am I correct, Mr. Icke, that this website popped up and that you received this e-mail around the time of the Temporary Restraining Order hearing in this case?

A.      Immediately after. As I understood it from my New York lawyers, when they told me that the Judge's order had been signed, this came very, very soon afterwards.

Q.      And the subject of this e-mail is: "EAT SHIT AND DIE, DAVID ICKE"?

A.      Yes. And it informs me that whoever the writer is used to support me but now he's my number -- number enemy. I take it that's No. 1 enemy. The philosophy of this — That his philosophy is an eye for an eye, a tooth for a tooth. "I must exact revenge for you. The same manner you attacked me, I will execute against you. I am going to get revenge against you, the likes of which you have never seen. By this, I mean I will do to you what you did to me, and better, I will destroy your business like you did mine. I promise to retaliate. You have my guarantee. You did what you said you were going to do. Now it's my turn. By the way, people should know that you are a Satanist, David Icke. Although I am thousands of miles away, I say 'fuck you' to your face. I hope you choke on your own vomit." And then there is another e-mail address which was again an anti-Icke e-mail address -- sorry -- a website.

Q.      Okay.

(Tr. Vol. I p. 104, l. 25 - p. 108, l. 11).

Plaintiffs' Exhibit No. 22 is set forth in its entirety.

The effect on Icke in receiving no royalties since February, 2006, has been "devastating." Revenue from his books is his sole source of income. He needs the revenue from his prior books so he can continue to write. He has been advised by Mr. Smith at Bookworld that one of his most popular books, *The Biggest Secret*, is out of circulation.

Originally, Icke believed the original agreement with Adams was that Icke would secure the printing and sales of Icke's books in the United States. Then, when Adams continually represented that there were insufficient funds being generated from the sale of books, Icke agreed that foreign translation requests be put through Bridge of Love USA to increase revenue. (Tr. Vol. I p. 129, l. 10-25). Icke's earlier website recited that Royal Adams was Icke's business partner and trusted friend, confidant, and answers most of the business related questions regarding tours, seminars, publications and so forth. Icke testified that this information was accurate, early in the parties' relationship, but that language was later removed. Icke further testified that as part of their agreement, Adams was to fund the first printing of *And The Truth Shall Set You Free; I Am Me, I Am Free*; and *The Biggest Secret*. However, as the books were printed, Adams told Icke that he had a major problem with an investment scheme and needed to get his money back immediately. Icke agreed to forego any income from the books until Adams had been paid back, so in reality, Icke funded 75% of the first printing of the three books. (Tr. Vol. I p. 163, l. 20 - p. 164, l. 7).

In the front of the book, *Children of the Matrix*, there was a statement, "[i]f you would like David Icke to speak at your conference or public meeting, contact Royal Adams in the United States. Icke claims that this was a statement earlier contained in a publication of that book, and the insert was re-printed with that language, even though Adams "had no input into that side of things since the late 1990's except where he's passed out information to me for people that want to contact me for various things." (Tr. Vol. I p. 135, l. 17 - p. 136, l. 2).

Before Icke met Adams in late 1998, a company known as Truth Seekers printed and marketed Icke's books in the United States. (Tr. Vol. II p. 186, l. 24 - p. 187, l. 4). Adams signed the contract for the printing of Icke's books with Patterson Printing. Icke was involved in

the negotiations and has asked for a copy of the contract which has not been supplied. Ron Smith, Bookworld chairman, told Icke that millions of dollars have been paid to Adams.

Icke has been a published writer since 1983 when he wrote the book, *It's A Tough Game, Son.* He has been publishing himself since 1994-95 when he published *And The Truth Shall Set You Free.* He is a nonfiction writer. (Tr. Vol. II p. 187, l. 8-18).

Icke describes the role of the publisher as it relates to the author.

The publisher sees to getting the artwork together, designing the book, having the text proofread, having it indexed, liaising with the author on any changes the author wants, coming up with the final printing disk which goes to the printer, and that's what I do; all of that right up to the disk going to the minute.

(Tr. Vol. II p. 189).

| | |
|---|---|
| Q. | Okay. |
| A. | So that is not what an author does when an author writes for a publisher. |
| Q. | Right. An author just does the writing and then they may give him some kind of corrections? |
| A. | Yes. The author will produce the text, any illustrations he might want. If there are illustrations that have to be produced as original artwork as opposed to just pictures, the publisher will arrange for that to happen. They will do all the text reading. They will suggest changes. They will say what they don't think should go in and should go in and all the rest of it, and that's what happens. And that's what I do, all of that. |
| Q. | Okay. A publisher, for instance, doesn't have any input, other than maybe critical input, into what's in a book. |
| A. | Could you repeat that for me? |
| Q. | The publisher doesn't have any input, other than critical input, as to what goes into a book; critiques, criticisms, corrections. They don't -- They don't say, "This is the way the book should go," or, "I don't like this; do it this way." |
| A. | Oh, sometimes they will, I'm sure. They will -- They will -- They have editors, and the editors will discuss with the author after the -- usually after the first draft is produced, and they will make suggestions on what goes in and what doesn't go in; whether it's written in a certain way and would be better this way, all those things. I do all those things. |
| Q. | All right. |
| A. | All that area is covered by me. No one else does that. |
| Q. | So the traditional big publishers may actually want a little more control over the finished product. |

A. The reason I publish my own books is so that I have control over the finished product. That's the whole point, among other things, of wanting to be in control of my own work instead of having a corporation dictating to me.

Q. Is there -- Is that the reason why you didn't go to, say, Random House or Simon & Schuster?

A. I wanted to be in control of my own work and to have control of the content so that I wasn't being pressured to leave things out that I wanted to go in, and that's one reason. And the other thing is that I wanted to be my own publisher.

(Tr. Vol. II p.188, l. 20 - p. 190, l. 17).

Icke describes his first encounter with Adams,

Q. Now when you first met Royal Adams, what attracted you to him?

A. His enthusiasm for supporting my work to the point where he said he would do it for free. He just wanted to support what I was doing. And I thought, well, if someone is enthusiastic enough to come along and say they'll do it for nothing, then I'll give this man a chance.

Q. Okay. And you made a couple of statements yesterday that you were stimulated by -- or this is paraphrasing -- his assertion that he was a millionaire or that —

A. Could you repeat that question?

Q. You made some statements yesterday -- in fact, on several occasions -- that you remembered and that it struck you that he was a millionaire or that he said he was a millionaire.

A. No, I didn't say it struck me. I said that's what he said when explaining why he would do it for nothing.

Q. Okay. I mean did that in some way, the fact that he had enough money to do things on his own or that he was possibly a millionaire, did that, in fact, play any part of getting involved with him?

A. The books, they generate their own sales, and that is what has happened ever since. So my prime motivation was to have the books in print in America because that would generate the income necessary by itself without any other input. The fact that he said he had the money to fund the first printing was, obviously, of interest to me, but as we discussed yesterday, in the end it was my pocket that funded that.

(Tr. Vol. II p. 190, l. 18 - p. 191, l. 19).

Icke's books are sold in ten or twelve countries, notably, Japan, Germany, Switzerland and South Africa. Icke subsidizes others from the sale of his work.

Q. Well, I understand that. Yesterday you talked about one of the videos that we have here, and you said that -- the video with the gentleman in South Africa, I believe -- that you're not paid for that?

> A. No. Credo Mutwa, the 85-year-old Zulu who runs an AIDS clinic where he treats AIDS victims for free and desperately needs the money to do so, has not had royalties from American sales of that video/DVD since 2001. And I have just paid him, from what is left of my money, $10,000 because of my outrage that this has been done to him. Every penny he is owed from sales of that DVD and video in Europe and Britain has been paid to him in an ongoing way all through these years. That's what I said.

(Tr. Vol. II p. 200, l. 10-22).

Icke acknowledges that in the cover of all of his books when they were first printed in the United States there is language which states, "by Bridge of Love Publications USA," and "for the most part . . . it gives the address of 1825 Shiloh Valley Drive in Wildwood, Missouri," the American contact address, the address connected to Adams. (Tr. Vol. II p. 205, l. 12 - p. 206, l. 3).

Icke is clear that Adams was not involved in distributing his books. Bookworld is the distributor of the books.

> Q. Okay. So at any rate, we have Mr. Adams who has an agreement with you to -- to facilitate the printing and production of your books.
>
> A. No, no. He had an agreement to facilitate the printing and, through Bookworld, the distribution. He didn't distribute my books. Bookworld distributed my books. He did not have an agreement to produce my books because I produced my books from first idea to disk arriving at the printer for printing.
>
> Q. Right. So he didn't produce. He was involved in facilitating printing and marketing of your books.
>
> A. Distribution through a distributor. I marketed my books and the distributor marketed my books, not Royal Adams.
>
> Q. Okay. And so these books that I have in front of me and the attending videos over there, they were -- they were produced by you during the association with Mr. Adams.
>
> A. Correct.
>
> Q. And they were printed by -- most of them from Patterson. The other one is from the other company, Bertelsmann. They were produced and printed during the association with Mr. Adams.
>
> A. Yes; produced by me.
>
> Q. And then Bookworld marketed and distributed the books during your association with Mr. Adams.
>
> A. Correct.

(Tr. Vol II p. 206, l. 21 - p. 207, l. 20).

Icke has never established a formal business entity in the United States called Bridge of Love USA. He used the name before he met Adams. (Tr. Vol II p. 235, l. 1-8). Adams had no involvement in the creation of any of Icke's works, no direct activity and very limited indirect activity in advertising Icke's books.

> Q. During Cross Examination yesterday there were a series of questions where you were asked about the creation and the distribution of your book. And just to make sure there's no ambiguity on the record, did Mr. Adams have any involvement in the creation of any of your works?
>
> A. He had no input into the creation of any of my books whatsoever from idea right through to the disk arriving at the printers for printing, and I did all of that.
>
> Q. Okay. Are you aware of any advertising that Mr. Adams did in connection with your works in the United States?
>
> A. No, I'm not. The only advertising that I am aware of is when Bookworld came on and said, "Do you want to pay to have your books in our catalog that goes out to potential book sellers all over the United States?" And Mr. Adams said to me, "Do you want to do this?" And I asked about the cost and said "okay" on, I think, one or two occasions; "We'll do it." And so that's the only advertising I know about which was the catalog of Bookworld promoting the books that they distribute to potential markets.

(Tr. Vol II p. 235, l. 9 - p. 236, l. 2).

Michael Wedlock ("Wedlock"), an accountant for 26 years, was employed by Icke. He communicated with personnel at Patterson Printing on behalf of Icke and received "Excel schedules" for printing and distributing which he downloaded covering the period January to October, 2005. (Tr. Vol II, p. 249, l. 1-25). The Wedlock report is Plaintiffs' Exhibit No. 28. He concluded under the Financial Accounting method that from January 1 through October 31, 2005, total sales of 43,540 of Icke's seven books totaled $1,081,147.00. Bookworld received $709,406.00 for commission costs and Patterson Printing was paid $119,514.00. After another charge to Bookworld of $6,329.00 for book storage and return expenses, net profit for the period

was $255,317.00.[7]  From that Wedlock deducted $140,500.00 for "[o]ther expenditures (per

BOL finance summary)," leaving $114,817.00 as "[n]et profit for the period 1/1/05 to

[10/31]/05."  (Pl. Ex. No. 14) (Tr. Vol II p. 252, l. 14 - p. 253, l. 25) (Pl. Ex. No. 28 p.2).

Wedlock concluded that there was no proper accounting for 28,723 books valued at $77,803.00.

Wedlock then employed a "cash accounting" approach to conclude that "[n]et funds in business as

of [10/31]/05 to be $82,476.00."  He thinks there should be that balance in the checking account

as of that date for cash flow purposes.  Additionally, he believes there was $38,594 in books in

stock as of that date.  Both approaches employed by Wedlock resulted in a positive cash flow and

positive cash balance based on Bookworld's costs and sales figures.

After this Court issued its temporary restraining order on June 9, 2006, Bookworld

supplied Wedlock with supplemental information for the period August 2001 through May 31,

2006. Wedlock then created Plaintiffs' Exhibit No. 29 which, for each of those years, lists

columns showing income, cost of sales, overhead, and net profit. Wedlock concluded that Icke

has been underpaid by Adams $953,509.32.  The only assumption Wedlock made was the amount

for "overhead" which for the six years totaled $144,000.00.

It is clear that Adams has been paying personal expenses from funds lawfully belonging to

Icke, all without Icke's consent or knowledge. Wedlock looked at calendar years 2001 through

2006 after getting a box of documents from Adams including checks, receipts deposits and other

material.  On Plaintiffs' Exhibit 30, Wedlock listed various individuals or businesses to whom

checks had been written.  Wedlock was not supplied with a full set of banking records, but instead

saw photocopies of checks and check deposits made out to Bridge of Love USA.  Very few of

[7]This also includes minimal profits from DVD sales ($8,334) and video sales ($1,608.00)
for the same ten-month period.

the payees, according to Icke, had any connection to Bridge of Love USA. Vince Petracek was paid $35,146.00; Craig Russell was paid $11,188.00; Sparks Fireplace was paid $6,722.00; Carynn was paid $9,585.00; Washington Mutual was paid $24,808.00; Chris Lazarov was paid $3,575.00; Lawn Systems was paid $3,814.00; K.N.I. was paid $20,748.00; Dorothy Kigler was paid $8,000.00; Tony Indilicato was paid $26,500.00; Harley Davidson was paid $12,777.00; Eureka Nursery was paid $38,620.00; Patti Davis was paid $1,944.00; County Mutual Insurance was paid $4,829.00; Citi Advantage was paid $155,298.00; Custom Homes was paid $7,150.00; Ameritech/Amerigas was paid $4,796.00; First Nationwide was paid $23,900.00; First Tennessee was paid $10,170.00; 5th Third Auto Leasing was paid $7,245.00; AAA Landscape was paid $1,704.00; Carynn Adams was paid $38,000.00 and Ruby Adams was paid $30,700.00. He believes these are unauthorized sums.

Plaintiffs' Exhibit No. 31 is "BOL Income from paperwork provided by Adams" prepared by Wedlock. These are payments made to BOL without explanation, e.g. TGS Hidden Mysteries for $11,124.00; checks paid into the bank account in the amount of $42,745.00; $18,000.00 by Adams family; "composite check deposits" of $232,441.00. The total amount received is $315,183.26.

Adams believes that a partnership agreement was forged between him and Icke after the two first met in Sedona, Arizona. His version of the terms were that Icke was in need of funds to have the books printed, "can you help?" Adams said "yes." (Tr. Vol. III p. 333, l.7). Adams proclaims, "I helped supply all the money to get books printed; yeah." (Tr. Vol. III p. 333, l. 10). This is the extent to which Adams ascribes the parameters of his understanding of the "partnership."

Adams makes many rambling statements in an attempt to refute Wedlock's accounting conclusions, but produces no rebutting evidence. His references to "from memory" are not persuasive, e.g. "Q. Okay. And were you keeping an accounting of the United Kingdom Bridge of Love purchases with you as well? A. Yes. Not -- A lot of it was done through my mother, but I was keeping it loosely, yes." (Tr. Vol. III p. 349, l. 23 - p. 350, l. 1).

When Adams began negotiating with Patterson Printing and Bookworld, he had first gotten the information from either Pamela Richards, now the wife of Icke, or from Icke. (Tr. Vol. III p. 350, l. 22 - p. 351, l. 4).

Adams confesses that he still has not made a profit:

Q.      Okay. And, yet, at this point you still haven't made a profit. You haven't gotten back the losses that you put into it.

A.      At this point today, if -- if -- if -- if Bookworld were to disperse cashes that they are now holding in escrow, it could be very close, yes. But as of now, no.

Q.      Okay. So -- Excuse me. You're close -- If everything went through the way you want it to go, you're close to making a profit. Is that correct?

A.      Well, if we continue the way that we are, we're close to the company making a profit, yes.

Q.      Okay. So that means that Mr. Icke would make a profit if everything went the way it was headed.

A.      Yes.

(Tr. Vol. III, p. 357, l. 10-23).

Adams approach to accounting is novel:

Q.      Okay. But there is -- Do you have a set of black books that look like ledger books -

A.      No, I don't.

Q.      --- that have accurate ---

A.      No, I don't.

Q.      Okay. So your way of doing accounting is not by using, for instance, a black book set of ledgers or —

A.      I use cash; what's on hand; what do I have to spend. Let's spend it on books.

Q.      Well, did you ever think about, for instance, getting a computer program for doing all of the accounting?

A.      I thought about it. It's a lot of work, that data entry every day –

Q.      And ---

> A.      -- and expensive. I didn't think the company needed to have someone data entry all that in. You know, I didn't see the need. I do see the need now.

(Tr. Vol. III p. 372, l. 3-19).

There is overwhelming evidence that Adams misappropriated funds belonging to Icke.

When asked directly by his counsel about any misappropriation, Adams makes a denial:

> Q.      Okay. And at any time in this association, in this partnership, did you misappropriate or use for your own purposes any of the money that came in as profit?
> A.      No, because -- There were checks that I spent, yes. There were checks that were reimbursed. So the bottom line on that would be "no."
> Q.      And there was something else troubling you about that question. I said: Did you use any of the money that came in as profit? You looked at me puzzled. Was there something else that you had to say? What's your position?
> A.      There is no profit. I'm puzzled. You're talking about profit. We've been red lining it.

(Tr. Vol. III p. 379, l. 20 - p. 380, l.6).

Adams is an unbelievable witness. His feet seem to be firmly grounded in space.

Throughout his testimony, he makes bold statements, none of which appear to be supported by documents or other proof. As an example, he says the "business" is dead because of the cessation of printing and halt of business, yet, like a magician, he claims to be able to take what he says was never a profitable business, to successful status, without ever supplying names of individuals at Bookworld on leading questions from his own counsel:

> Q.      Okay. And now as a result of the cessation of printing and the halt of business, what is your feeling about the future of the company?
> A.      It's dead.
> Q.      Okay. And what is your feeling about the possibility of profit at this point because of this action?
> A.      I could bring it back together. I've got -- Bookworld has -- I was talking to them, even through all this, you know, constant communications with books and seeing where we were at with things. We've got probably -- It was more, but there's been so many returns; people scared of getting caught with books that may not sell. As I recall, we're at 350,000 money in and money coming in combined. That is just about what would be needed for reprint.
> Q.      Okay. And who's the -- Who is the contact person at Bookworld?

> A. To be honest, we would probably need more than that, but I can get by with that.
>
> Q. Okay. Who's the contact person for Bridge of Love, United States for Bookworld?
>
> A. Depending on what I want to talk to them about.

(Tr. Vol. III p. 380, l. 23 - p. 381, l. 18).

Under cross-examination, Adams was asked about the formation of what he believes is a partnership:

> Q. (By Ms. Wymore) How do you define the partnership that you claim that you created if there was no partnership as a formal entity ever established?
>
> A. Bridge of Love was a d/b/a off of Royal Personnel and starting up with the banking accounts. The partnership idea was -- was verbal and a handshake.
>
> Q. So it was an idea as opposed to an actual formal partnership, correct?
>
> A. I don't think that's true.
>
> Q. Why don't you think that's true? Did you or did you not set up --
>
> A. David was —
>
> Q. -- a formal partnership?
>
> A. Yes.
>
> Q. And you have -- You went through the State of Missouri or some other state to set that entity up?
>
> A. No.
>
> Q. Was there ever a formal partnership set up within the States of Missouri or any other state in the United States?
>
> A. That way, no, there was not.
>
> Q. And, in fact, Royal Personnel, Inc., was your company, correct?
>
> A. Yes.
>
> Q. And it is a sole proprietorship?
>
> A. Yes.

(Tr. Vol. III p. 383, l. 16 - p. 384, l. 16). All of this was done without Icke's knowledge or permission.

Adams is unable to produce any documentation that he is the publicist of Icke. He repeatedly makes the claim, but has no support in the record for that broad-sweeping statement.

> Q. Do you have any writing that would show that, in fact, you had ever been engaged by Mr. Icke to be his publicist?
> (Pause)
> You don't, do you, Mr. Adams?
>
> A. I think e-mails can be produced on that; not from me but from others.

It is the Court's impression that Adams fashions the "truth" to suit himself question by

question:

Q. Now you have seen the TRO that was entered in this case, correct?

A. Yes.

Q. Okay. You're talking about this money that Bookworld has had in research. Why has that money not been turned over to be put in the escrow account as was ordered by this Court arlier this year?

A. Well, they did. They turned it over at that point. This goes back to -- Maybe I was a little bit wrong on something here. They turned over all the escrow, according to Wil, at that moment. They turned over $78,000 to Robert Cox.

Q. When did they turn money over to Robert Cox?

A. Several months ago.

Q. How many times did they turn money over to Robert Cox?

A. I think just once.

Q. So that's the $78,000 check that you're referring to?

A. Yeah. I think they stopped when they found out that he was no longer an attorney and they didn't want to give him money if he's no longer an attorney. There is some that can still be turned over to escrow.

Q. But nothing to date has been turned over to escrow, correct?

A. $78,000 has been.

Q. Where is there $78,000 in escrow?

A. You'll have to ask Robert Cox that.

Q. In fact, there has not been, according to this TRO, anything turned over into escrow. Isn't that correct?

A. No, it's not correct.

Q. It's my understanding, based on information relayed to us last week -- in fact, I believe that you were present when I received the phone call and was on speaker phone -- that the $78,000 check that you're referring to has not been cashed and no one knows where it is but presumes Robert Cox has it.

A. I know Robert Cox got it. You're right. It has not been cashed evidently.

Q. So, obviously, it's not in an escrow account anywhere, is it, Mr. Adams?

A. Well, I don't know where he has it. I just know he has  it.

Q. We know he has a check, and we know that that check, at least as of last week, has not been cashed, according to Bookworld. Is that correct?

A. True.

Q. And no other monies have even been attempted to put into escrow under the conditions of this TRO, correct?

A. That pretty well, I think, cast out at that time the reserves; with probably something held back for returns at that time. Excuse me. It may have been another month before more monies come in, but you're right; no more money was sent.

Q. Who told Bookworld not to turn money over to anyone?

A.    You'll have to ask or I'll have to find out for you. I don't know. I assumed they got -- They talked to me about something; something that they received. Oh, I guess it was something showing that they received that Mr. Icke was no longer an attorney and so, therefore, felt —

Q.    Mr. Icke?

A.    That Mister -- Sorry. That Mr. Cox was no longer an attorney and felt -- Maybe they took it upon themselves; they thought it would not be good to send someone money who was not an attorney; protecting those assets.

Q.    Did you ever instruct them -- Why would Bookworld be determining what to do with the money? Have you given them any instruction on what to do with the money that they are collecting for the sale of books?

A.    Yes, I have.

Q.    What instruction have you given Bookworld?

A.    That they need to turn that money in to Robert Cox for escrow.

Q.    So that's what you told them?

A.    Yeah.

Q.    And then when they told you that they would no longer turn the money over to Robert Cox, what did you tell them?

A.    I just found that out last week. I didn't say anything.  I -- I understood where they were coming from. He's not an attorney. Why give him money? He's hasn't been really very trustworthy, and I do agree with their action not to -- not to give someone money that's not an attorney. It needs to be redirected. In fact, they told me, "We need" -- This is what they told me. "We need a new court order," they said, "having  us -- giving us new instructions as to where to reissue those monies." They did stop payment on that $78,000 I found out yesterday, and so you're right; it hasn't been cashed. And they said, "We need a new court order as to where to send this escrow."

Q.    Now the Court order did not tell them where to send the escrow money. You told them to send it to Robert Cox.

A.    I don't know what their court order said, but I did tell them that -- that it had to go to Robert Cox. I was told by Robert that he was going -- that you and him had agreed that he was to hold onto those monies and that you and him both needed to sign off on that before anything could be spent from it.

(Tr. Vol. III p. 392, l. 10 - p. 396, l. 1).

Adams claims that he has received no profits in the last eight years- -

Q.    Okay. Now you have claimed that you have not seen a profit in connection with the sale of David Icke's books until you were on the verge of a profit in early 2006. Is that your testimony?

A.    Yes, it is.

Q.    So you are claiming that for the last eight years, there has never been any net profits to distribute?

A.    Yes.

Q.      And this is based on the internal accounting that you have in your head. Is this correct? I mean there have been no records produced today –

A.      These —

Q.      -- that would show this to be the case, correct?

A.      Yes, there has, and there still will be produced those records. They are available.

Q.      Can you direct me to any exhibit that has been produced at this Preliminary Injunction Hearing to date that shows these -- the lack of profits or the accounting that you were testifying about this morning?

A.      You should have that information.

Q.      That's not my question. I asked you whether you had proffered evidence of your -- to back up your statements this morning that there are $490,000 in debt and that there has never been any profits to be distributed in Bridge of Love, USA?

A.      Today I cannot do that. I would love to engage a CPA to do this accounting to verify this in a record for everybody.

Q.      And so when you say that you have determined that there's $490,000 based on some type of an accounting, obviously not a CPA, what accounting are you referring to?

A.      Simple cash accounting, writing and looking, adding up checks that were dispersed for expenses.

Q.      And is this something that you yourself did?

A.      Yes.

Q.      And you have the physical documents --

A.      Yes.

Q.       -- to show what you did?

A.      Yes.

Q.      Where are those documents?

A.      They were all copied and turned in to you and to my attorney.

Q.      Well, I can tell you that they weren't turned in to me. And you personally have never given me documents, correct?

A.      Not you personally.

Q.      Okay.

A.      But all of that can be reproduced, I guarantee you.

Q.      By who?

A.      By me.

(Tr. Vol. III p. 401, l. 4, p. 403, l. 1).

Adams continually demonstrates poor business judgment with Icke's money:

Q.      Why had you never asked about missing books, if this has gone on for so long?

A.      I told you I did.

Q.      When did you first start asking?

A.      When David Icke asked me about them.

Q.      But you never noticed it before in the eight years that you've been doing this.

A.      No. No. I totally trust these guys.

Q.      You totally trust Bookworld?

|   |   |
|---|---|
| A. | Yep. |
| Q. | Yet, didn't you blame Bookworld for taking monies that belonged to David Icke or Bridge of Love? |
| A. | Yeah, I actually did do that. |
| Q. | But, yet, you trust them. |
| A. | Yes. It was my money that was borrowed on a short-term. It shouldn't have been done, but seeing that it was used for expansion, I turned my head. I told David about it and, you know, he wasn't happy and I understand that, but — |
| Q. | So it's your testimony that Bookworld misdirected funds for -- to help them with their building expansion? That's your testimony today? |
| A. | Exactly what they used it for, I'm not sure. That's what I've been told through the grapevine, yeah. |
| Q. | And that was what you told Mr. Icke – |
| A. | Yeah. |
| Q. | -- when he asked about the missing books? |
| A. | Yeah. |

(Tr. Vol. III p. 417, l. 5 - p. 418, l. 6).

Adams continually engages in a confusing "guess where the pea is under the shell game" shuffle. He says there are vitally important records that he has already turned over to opposing counsel, but they have never been received. Sometimes he says there are just records in his head. In any event, even after ordered by this Court to produce records, only limited records have been produced, although sufficient time has elapsed for Adams to have produced records, if they exist.

Accounting for foreign royalty payments is an example of Adams' inconsistent testimony:

|   |   |
|---|---|
| Q. | Is it your testimony that you turned over itemized accounting records regarding foreign translations to Mr. Cox? |
| A. | Yes. |
| Q. | And you don't know what he did with those records after that. Is that correct? |
| A. | No, but that also is stated in more than one place on income. It's stated in showing you on the complete outline that I handwrote, which I hope you got because it's this thick, --- |
| Q. | No. I've never seen anything like that. So you claim you also did a hand outline that you turned over to Mr. Cox to give to me? |
| A. | Each year, every check, every check itemized, who it went for, how much, all deposits, all bank statements, every money that came in from England, every foreign money that ever came in, every penny that came in from Hidden Mysteries; every penny do. |
| Q. | Do you have a copy of that? |
| A. | The copy that I had I had given to Robert Cox. |

Q.      Where's the original?

A.      I'm getting there. Robert Cox then had me go make a copy, one copy, that we brought back to the office and we gave to you.

Q.      Which you gave -- Are you testifying that you gave me something?

A.      No. I'm saying I brought it back to the office, meaning Robert Cox's office, and he gave that to you.

Q.      You saw him give it to me?

A.      No.

Q.      You have no idea whether he gave it to me. Is that correct?

A.      Well, that's not actually true.

Q.      Okay. I can tell you I don't have it.

A.      That disgusts me, Mary Ann. I did a hundred hours' worth of work on that.

THE WITNESS: Can I take a bathroom break?

(Tr. Vol. III p. 419, l. 25 - p. 421, l. 10).

Plaintiffs' Exhibit No. 32 is an e-mail message from Adams to Wedlock copied to Icke dated February 7, 2006. Adams confesses that he is making no claims to Icke's copyrights, then in a few breaths says that he is not conceding that he has no copyright interests in Icke's books:

Q.      But you're not making a claim to copyrights in here? You're not referring to copyrights that you believe you have in Mr. Icke's work?

A.      Does it say that? No, I'm not. I'm sorry. I don't mean to be –

(Tr. Vol. III p. 427, l. 11-15).

Adams recites some advice he received from a patent attorney:

A.      In fact, yes. He said, "There is no statute that says you can't continue to publish books that you've already financed and brought in up to this point. You can't do any new books, Royal, not without you and David coming to a new agreement, but," he says, "that would have to go to court and be heard; that you -- not claiming copyright ownership; you as the publisher, financing, would continue to have the right to publish the old books."

Q.      So it wasn't your understanding that you had a copyright interest but maybe some kind of a contractual interest? Is that what you're saying now?

A.      Well, you know, he did say there might be some sort of copyright interest, but, you know, I'm not here to take advantage of David or to steal books or any of that I'm here to publish these books, get this out to the world, and make money for us all.

Q.      And, yet, in this proceeding you are conceding that you have a copyright interest, are you not?

A.      No, I'm not.

(Tr. Vol. III p. 428, l. 4-22). Plaintiffs' Exhibit 33 is an e-mail message from Adams to Icke dated February 18, 2006. Adams advises Icke that an attorney said "we have about $1.4 million in stock (books and video)." Adams expressed an interest in settling all of his claims for $100,000.00. At trial, Adams said, "I pulled it from the air at that time."

Plaintiffs' Exhibit 34 is an e-mail message from Adams to Icke dated February 18, 2006. Adams continues to have trouble keeping his stories straight. There was no trick question presented to him. He testified under oath that he had not recovered his initial investment, then he was confronted with Plaintiffs' Exhibit 34. He testified as follows:

Q. And, in fact, you talked about the original investment as if that was something still owed to you, but you have been paid for that, correct?
A. No.
Q. Now you heard the testimony of Mr. Icke last week that you were paid back for the original investment by keeping net profits that should have been paid, correct?
A. I heard that.
Q. And I understand that you dispute that, but are you, sitting here today, saying that you never received -- you never recovered your initial investment?
A. I think it's common sense to look at the first year, and I suggested one book alone that Bookworld shows was brought in and received and none of the other products. The printing costs on that alone was $240,000.
Q. Okay. That's not my question. I'm just asking you if you're contending -- It's a simple question. Are you contending that you didn't get your initial investment back?
A. I said "yes" to that.
Q. Okay. Well, let me draw your attention to this third paragraph in which you say -- you told him, and I'm presuming this is the attorney, "I got back my original investment but it took several months and that as late as five months ago, I used another 30,000 of my money, not BOL's money, to pay for books but that I had gotten that back, too, but it took three months." So why were you telling your attorney and Mr. Icke that, in fact, you had received your initial investment back and subsequent investment back if that wasn't true?
A. You know, up to that point, like I say, I had not done an accurate accounting. I was using numbers in my head, money that was coming in, using recent numbers, and it wasn't until I went back and did the -- did the -- did the full accounting that I find out that I was still owed this kind of money.
Q. But you did get some monies back, correct?
A. We were not in a profit, and I don't know when that line was. It certainly wasn't '98, '99, 2000 or 2001 or probably even 2002 or 3.

Q. So there have been many inconsistent statements made in the e-mails that have been introduced and, in fact, your own testimony today regarding whether you've been paid back or not. Am I correct that it's what you think is what you say and then you may find out later on that you were wrong? I mean is that what keeps changing the story.

A. The accounting -- The accounting is the story, and all the documentation with that is the story.

Q. But you're the person who has control of the books and records by which we can undertake an accounting and, yet, after eight years of being involved with Bridge of Love, USA, we don't have any kind of a comprehensive accounting of anything.

A. That's not my problem. It was turned in.

Q. That's not what I'm saying. I'm not talking about what has been produced. I am talking about just evidence or a document or something that would show the accounting that you claim has occurred after all of these years.

A. That was produced and turned in.

Q. But you're talking even before this lawsuit began on February 18, 2006, about monies that were paid back to you. Did you have an accounting at that time?

A. No.

Q. So anything that has been done has been done subsequent then. Is that what you're saying?

A. I don't understand.

Q. Any accounting that you have done with respect to Bridge of Love, USA, am I correct that that is all post-February 18, 2006?

A. No.

Q. So you did have an accounting prior to February 18, 2006?

A. Yes. There was some accounting done, yes.

Q. And where are those accounting records?

A. There are none.

Q. Why aren't there any?

A. I don't know. You need to ask my dear old mother-in-law about -- I mean my mother about that one. We've been trying to get that. She was doing accounting basically on the -- on where I am with Bookworld as far as -- as far as monies owed, not -- not Bridge of Love accounting.

Q. Who is your mother-in-law?

A. I meant my mother.

(Tr. Vol. III p. 434, l. 21 - p. 437, l. 24)

In Plaintiffs' Exhibit 35, Adams confesses, "[n]ow, I have done things I did not want you to know about. Yes, I have, David, like invest 15,000 with Dharma Studios on a movie for you. Okay, there. There is the secrecy. It was done for the right reasons. To do a movie, we had 25 percent of the profits, but they have run away and stolen from us. I felt I had the right with you

to look out for us financially.  I see, I need to have Mother Hen watch over me.  Well, that isn't going to happen now or in the future."  Adams sees nothing wrong with this behavior.  Instead, he takes the opportunity to again enlarge his claim to Icke's business interests without any agreement or understanding with Icke.  Here, he claims to have investment authority:

> Q.    So essentially what you're telling Mr. Icke for the first time is you took $15,000 and invested it in something he knew nothing about and that you had not been engaged to do.
> A.    That was part of my responsibilities was to invest, --
> Q.    Part of your responsibility –
> A.    -- monies for Bridge of Love.

(Tr. Vol. III p. 462, l. 7-12).    Adams failed as a self-appointed investor:

> Q.    And you're saying that you took it upon yourself to make financial investments. Now you're not an investment banker, correct?
> A.    I'm not a banker, no.
> Q.    You're not an accountant.
> A.    No.
> Q.    What background do you have in finance and investments?
> A.    I do very good in investments.
> Q.    Personal investments?
> A.    Yes, some personal.
> Q.    What other investments did you make with respect to the monies that were coming into Bridge of Love?
> A.    That was one of my roles as well, to invest.
> Q.    That's not my question. My question is: What investments did you make other than Dharma Studios?
> A.    Well, Mr. Icke, Pamela Richards, Linda gave me their own personal funds to invest for them, and what turns out to be --what turns out to be a pyramid scheme. That was -- That was one.
> Q.    That you had -- You took their moneys to do that. Is that correct?
> A.    They asked me to invest their monies, their own personal monies.
> Q.    For something that you had discovered.
> A.    Yes.
> Q.    My question to you was: What investments did you make with monies coming into Bridge of Love –
> A.    Oh.
> Q.     -- other than Dharma Studios?
> A.    Let's see. Strategic Assets was one.
> Q.    What was that?
> A.    Strategic Assets.
> Q.    What is "Strategic Assets"?

A.      It was supposed to be an investment where you invested in that company and would get monthly returns from it. This is still pending under lawsuit. This company just did not pay. Another one was through Mr. John Wheeler who was going into currency trading. That was for $100,000. He was going into currency trading. It was offering us 8 to 12 percent a month, as I recall, off of that. It looked very good. I checked the background on this person and very trustworthy. However, it turns out that he took a lot of people's monies, gambled it away, and he's now in jail. He's in prison.

Q.      What other investments did you make with Bridge of Love money?

THE COURT: Wait. So was there 100,000 sent to Mr. Wheeler?

THE WITNESS: Yes. Yes, sir.

THE COURT: Okay.

A.      I think that may be it.

Q.      (By Ms. Wymore) So, so far you have testified that you made essentially four investments because you felt it was your role to do this with Bridge of Love money; $15,000 to Dharma Studios but you were ripped off; 100,000 to —

A.      That's not -- That's not true. That's still going on –

Q.      What's still going on?

A.      -- as far as I'm concerned. Dharma Studios. This is something that -- Last time I heard from them, this is still a very real possibility.

Q.      Okay. Now let me draw your attention to what you wrote to Mr. Icke because it is inconsistent, it would seem, with what you're testifying now. You say, "Now, I have done things I did not want you to know about. Yes, I have, David, like invest 15,000 with Dharma Studios on a movie for you. Okay, there. This is the secrecy. It was done for the right reasons. To do a movie, we had 25 percent of the profits, but they have run away and stolen from us."

(Tr. Vol. III p. 464, l. 7 - p. 466, l. 24). Adams invested $35,000 with Stretegic Assets without Icke's knowledge. (Tr. Vol. III p. 469, l. 3-5).

It is clear that Adams took large sums of money belonging to Icke without Icke's knowledge or consent and converted that money to his private use. Plaintiffs' Exhibit 30 outlines many of the unauthorized expenditures. He admits that he has been advised by the Internal Revenue Service that he has been co-mingling Icke's funds with his personal funds. Adams admits paying for personal charges from the account in which Icke had a 75% interest, but Adams claims that he repaid all sums into the account. There are no records produced by him to support

his claim. His justification for paying his personal expenses from this account was that it was for "ease." (Tr. Vol. III, p. 482, l. 1- p. 483, l. 8).

The following expenditures are examples of Adams' unauthorized spending of Icke's funds. Magic Moreno is a Hollywood producer and music sound engineer, hired by Adams to engineer his personal CD. Adams spent $3,900.00 directly from the Bridge of Love account. (Tr. Vol. III p. 480, l. 20). He spent money from the Bridge of Love account to the ONYX Sewer District for his home - - $310.00; Tom Pallozola, a music teacher (he teaches Adams guitar) - - $4,633.00; Vince Petracek, a contractor for improvements at Adams's house - - $35,000.00; Craig Russell, Adams's spiritual advisor - - $$11,000.00; Sparks Fireplace for a fireplace in Adams' house - - $6,722.00; Schafer for distilled water at Adams' house - - $770.00; Carynn Spengler, Adams, former wife for child support - - $9,583.00; Washington Mutual for Adams' house payments - - $24,808.00; Lawn Systems for lawn care at Adams' house - - $3,804.00; Chris Lazarov for massage therapy for Adams - - $3,575.00; Dorothy Kigler, Adams' mother-in-law for a business loan for Bridge of Love - - $8,000.00; Tony Indilicato to repay him for money Adams lost in an investment - - $26,500.00; Harley Davidson for a motorcycle for Adams - - $12,777.00; Eureka Nursery for flowers for Adams' home - - $1,944.00; Patti Davis for her medical expenses which she could not pay - - $4,829.00; Citi Advantage for Adams' credit card charges - - $155,298.00; Custom Homes for charges for which Adams has no recollection - - $7,150.00; and 5th Third Auto Leasing for a car Adams leased – $7,245.00. All of these expenditures were for personal expenditures for Adams from money mostly belonging to Icke. (Tr. Vol. III p. 480, l. 20 - p. 491, l. 3).

Irrespective of the record of complete failures of Adams' investing for Bridge of Love, he still does not appreciate the scope of his incompetence as an investor nor does he confess that he misappropriated or stole money belonging to Icke:

> Q.     Now you testified about a number of bad investments that you made. Did you ever make a good investment for BOL?
> A.     I think David and Pam were pretty happy with what happened.
> Q.     That was something personal you testified. I'm asking whether -- what good investment did you make for Bridge of Love?
> A.     I'm not to the frame of mind yet that the ones I made are not good investments.

(Tr. Vol. III p. 515, l. 17-25).

Icke was recalled as a witness. He testified that he never authorized Adams to make the following disbursements and he did not know Adams was making such expenditures:

> 1. Dharma Studios - - $15,000.00;
>
> 2. Strategic Assets - - $35,000.00;
>
> 3. John Wheeler - - $100,000.00;

Icke testified that he neither authorized nor nor directed Adams to invest Icke's money. Promotion and marketing was done by Pamela Icke from November, 1998 through March, 2006. Adams had absolutely no involvement in Bridge of Love UK operations.

## II.   DISCUSSION

Relevant factors in deciding whether preliminary injunction relief should be granted are well defined, and in this case, easily determined.   The landmark case of *Dataphase Systems, Inc. V. C L Systems,* 640 F.2d 109 (8th Cir. 1980) teaches that consideration of appropriateness of injunctive relief is case specific.

> At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. [FN5] The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with

mathematical precision is misplaced.

FN5. The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated.

Love v. Atchison, T. & S. F. Ry., 185 F. 321, 331-32 (8th Cir.) (Sanborn, J.), cert. denied sub nom. West v. Atchison, T. & S. F. Ry., 220 U.S. 618, 31 S.Ct. 721, 55 L.Ed. 612 (1911). See also Chicago, B. & Q. R. R. v. Chicago Great Western R. R., 190 F.2d 361, 363 (8th Cir. 1951).

[3] In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less. Dataphase Systems, Inc. v. C L Systems, Inc. 640 F.2d 109, *113 (C.A.Mo., 1981).

Those factors will be individually considered, after the Court addresses Adams' challenge to the Court's jurisdiction.

Defendants challenge the Court's jurisdiction by first claiming that Icke's claim of copyright infringement is without merit. Adams argues that Icke did not have properly registered copyrights when he filed his complaint on April 24, 2006, and therefore the Court has no jurisdiction requiring Icke's complaint to be dismissed, citing *Strout Realty, Inc. v. Country 22 Real Estate Corporation,* 493 F. Supp. 997 (Mo. W.D. 1980). There, plaintiff relied on a common-law copyright theory which the District Court rejected for failure of plaintiff to comply with 17 U.S.C. § 411. The facts of that case do not support Adams' claim to ownership interests in Icke's copyrights. Icke is clearly the registered copyright owner of the above described books as of May 1, 2006. Icke filed his Amended Complaint on May 23,

2006, a date after his copyrights were registered. Icke's books are properly copyrighted in his sole name. He has proved that the material in each of the books is copyrighted. Icke has proved actual copyright infringement by Adams.

Adams next argues that the copyright protection Icke claims is not valid . Defendants' reliance on *Strout Realty, Inc.* is misplaced, for reasons already stated. Likewise, *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010 is not availing for Defendants. There, the copyright which was the subject of infringement was not valid because *Action Tapes* did not deposit the required source codes for its computer software product and so did not make proper copyright application. Here, Defendants do not claim the copyrights were invalid, rather, they claim that on the day Icke's compliant was filed, Icke had not filed for copyright protection. His amended complaint was filed after the copyright applications were filed. Defendants' arguments on this basis are rejected.

Adams next argues that he owns the copyrights jointly with Icke and accordingly, since co-owners of copyrights cannot infringe against each other, Icke cannot prevail. Defendants are correct in this analysis that co-owners cannot sue each other for copyright infringement, however, it is clear beyond question that Defendants and none of them individually or collectively have any ownership interest in any of the copyrights.

Adams cites *Community for Creative Non-Violence v. Reid,* 846 F.2d 1485 (D.C. Cir. 1998) for the proposition that Adams is joint copyright owner with Icke, and accordingly, because co-owners cannot infringe upon the rights of another, Icke's copyright infringement claim must fail. The *Reid* case is inapposite. There, a dispute arose over the rights to a sculpture. Two separate parties who claimed to have made creative contributions to the sculpture and its pedestal. The Court ruled:

41

In sum, were it not for the prevailing confusion over the work for hire doctrine,[FN18] this case-once more taking the record in its current state-might qualify as a textbook example of a jointly-authored work in which the joint authors co-own the copyright. We note in this regard Reid's original and creative contribution to the figures; CCNV's contribution to the steam grate pedestal added to its initial conceptualization and ongoing direction of the realization of "Third World America"; and the various indicia of the parties' intent, from the outset, to merge their contributions into a unitary whole, and not to construct and separately preserve discrete parts as independent works. *See Strauss v. Hearst Corp.,* 1988 Copyright L. Rep. (CCH) ¶ 26,244 (S.D.N.Y.) (magazine's initial conceptualization, ongoing supervision, and creative contributions to photo layout indicate co-authorship of joint work with photographer). We do not instruct the final decision, however, so that Reid may have a full and fair opportunity to rebut CCNV's joint ownership claim and to pursue a question Reid has raised regarding the identity of potential joint authors.

FN. 18 The *Easter Seal Society* court stated that the work for hire claim made in that case would probably have failed on any view of the 1976 Act. The tapes there in question had been "commissioned as part of an audiovisual work within the meaning of § 101(2)," 815 F.2d 336; under § 101(2), such a work constitutes a work for hire only if the parties, in a signed writing, "expressly agree" to that designation. In this case, no such alternate ground of decision is available, and conflict with *Aldon Accessories* is unavoidable. Had we determined that the "sufficiently supervised and directed" test framed in that case correctly construed the 1976 Act, we would have affirmed the district court's judgment declaring Mitch Snyder, as trustee for CCNV, exclusive owner of copyright in the sculptural work "Third World America."

The facts of the case under submission and the Reid case share no common principles.

Adams is not now nor has he ever been an author and in any event, in no capacity claims to have made any creative contribution to any of Icke's books.   In the Reid case, two creative parties were in contention.  To the contrary here, Adams disclaims any such contribution.  His theory seems to be that his interest in the copyrights arose from his role in the partnership agreement between him and Icke.  There is no credible evidence in the record to support any conclusion that any agreement was ever made between Icke and Adams that Adams would ever have any ownership interests in any of Icke's books.  The evidence is that there was never any intention that Adams would have any interest in Icke's books.  There is no credible evidence that any

actions taken by Adams and confirmed by Icke granted any ownership interests in any of Icke's books. All credible evidence is that under all of the facts of this record, Adams never acquired any ownership interests in Icke's books.

In cases where someone is making a claim in the proprietary work of an author, the claimant is advocating that she or he contributed material to a book or co-authored the book. *See Weissmann, M.D., v. Freemam, M.D.,* 868 F.2d 1313, 1318 (2nd Cir. 1989) (district court determined that Defendant was a co-author which ruling was found to be erroneous because for one to be a joint author of a derivative work, each putative author must have contributed to the work and each must have intended to contribute to a joint work at the time his or her alleged contribution is made). Adams contributed nothing as an author. He has no rights of any kind to any of Icke's books as an author, co-author or contributing author. At this stage of the case, there is clearly no credible evidence that Adams has any rights whatsoever to the copyrights. First, he confesses that he made no contribution to any of the books as an author. 17 U.S.C. § 101 defines "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." Adams made no contribution of any description to any of Icke's books. There is unrefuted evidence that Icke never intended Adams or anyone to ever have any contribution to any of his books which he regards as his children. It is not possible, under the facts before the Court at this time, that Adams could have formed an intention independently, or with Icke, to merge a contribution to any of Icke's books, since there is no evidence that Adams ever formed in his mind that he had any contribution to any of the books. In fact, the evidence from Adams is that he made no contribution to any of the books.

Next, Defendants alternatively argue that Icke, as a copyright holder, relinquished any right to sue for copyright infringement. Defendants seem to confess, that at most, since there are no written agreements granting a license to any Defendant, that Defendants have non-inclusive implied license supported by consideration. While there is no credible evidence that Adams was a publisher for Icke, that ruling, here, is not required.

Defendants cite the case of *Evolution v. Suntrust Bank*, 342 F.Supp.2d 943 (D.C. Kan. 2004) for the proposition that a licensor's remedy against a licensee who violates the terms of a copyright license is generally a claim for breach of contract unless the license, in which case, copyright infringement is appropriate. There is no credible evidence that Icke granted a license to any Defendant, or anyone, to publish any of his books. That ruling, however, is likewise unnecessary at this stage. The Court finds that there is a very high likelihood that Icke will prevail in any dispute that Adams exceeded the scope of any agreement that existed between Icke and Adams. Defendants' argument that Icke can bring no claim of copyright infringement against Adams is rejected.

Next, Defendants argue there is no copyright infringement by any Defendant. Adams is of the view that he has a right at a minimum to sell or order the sale of Icke's books in the hands of Bookworld at the time Icke terminated the partnership agreement between Icke and Adams. There is a very high liklihood that Icke will prevail over Adams in Icke's copyright infringement claim.

> We begin with a basic principle of copyright law. Once a plaintiff has proven that he or she owns the copyright on a particular work, and that the defendant has infringed upon those "exclusive rights," the defendant is liable for the infringement and this liability is absolute. The defendant's intent is simply not relevant: The defendant is liable even for "innocent" or "accidental" infringements. *See, e.g., Coleman v. ESPN, Inc.,* 764 F.Supp. 290, 294 (S.D.N.Y.1991); *Little Mole Music v. Spike Investors, Inc.,* 720 F.Supp. 751, 754-55 (W.D.Mo.1989). "[E]ven where the defendant believes in good faith that he is not infringing a copyright, he may be

found liable." *Pye v. Mitchell,* 574 F.2d 476, 481 (9th Cir.1978). *Pinkham v. Sara Lee Corp.,* 983 F.2d 824, *829 (C.A.8 (Minn.),1992).

The *Pinkam* opinion further concluded:

> " '[A]nyone who violates any of the exclusive rights of the copyright owners,' that is anyone who trespasses into [the copyright owners'] exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in *834 the statutes 'is an infringer of the copyright.' " *Sony,* 464 U.S. at 433, 104 S.Ct. at 784 (citing 17 U.S.C. § 501(a)). The copyright owner's enumerated rights include the exclusive right to "reproduce the copyrighted work in copies" and to "distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(1), (3). Camex infringed upon Pinkham's copyright in two ways: First, by printing 300,000 copies of *Mary Ellen's Best of Helpful Hints,* and second, by selling those copies. *Id* at 833,834.

*Pinkham v. Sara Lee Corp.,* 983 F.2d 824, 833 -834 (C.A.8 (Minn.)1992).

This Court has jurisdiction arising under 28 U.S.C § 1332(a). The matter in controversy exceeds $75,000 and the action is between Adams, a citizen of the United States, and Icke, a citizen of a foreign state, Great Britain. Additionally, this Court has original jurisdiction of all civil actions arising under the laws of the United States. This action involves, in part, rights to original writings subject to copyright protection under the laws of the United States. Finally, this Court has jurisdiction under 28 U.S.C. § 1367 over Icke's state law claims of breach of contract, unjust enrichment, conversion, and breach of the covenant of good faith and fair dealing.

The Court finds that Icke will suffer irreparable harm and the harm to Icke, in the absence of granting him temporary injunctive relief against Defendants, is clearly outweighed by any harm that will be suffered by Defendants. In the absence of Adams and all Defendants being enjoined from the further interference in the orderly printing and distribution of Icke's books, and receipt of money belonging to Icke, Icke will continue to suffer very serious financial damage from the continued acts of Adams. Harm to Icke continues in the absence of successful printing and distribution of his books which, it is understood, such printing and distribution is subject to the

vagaries of limited timely public demand. Additionally, Adams must be enjoined from further misappropriation or theft of Icke's money. Without being enjoined, based on his past behavior, it is likely that Adams will continue to misappropriate Icke's money, and based on the evidence before the Court, Adams lacks the ability to compensate Icke for money already misappropriated. Furthermore, Adams claims that the partnership between himself and Icke only produced losses, and he has now associated himself with many other authors, or, according to his testimony, at least four. Disassociation with what Adams claims was an unsuccessful venture and his involvement with other authors, leaves the impression that he will have a source of income from those associations. Based on all of the evidence before the Court, Adams must have no further involvement in the printing or distribution of Icke's books, or in collecting any money from past or future sales of any of Icke's books.

The next *Dataphase* factor addressed is the probability that Icke will succeed on the merits in this lawsuit. The answer is yes. It is beyond dispute that Icke is the sole author of all books bearing his name. Adams is not now nor has he ever been or claimed to have contributed as much as one word to any of Icke's books. All of the research and writing were solely the work of Icke . Adams never contributed as much as a thought or a suggestion that is incorporated into any of Icke's books. As noted above in Plaintiffs' Exhibit No. 12, Adams stated "[y]our [sic] the author my friend . . . " Adams never claimed any proprietary interest in any of Icke's books until late in his testimony at trial. Icke confirmed that Adams had no involvement in terms of content of the books, and in answer to a question, "[y]ou had absolutely no involvement in the books themselves in terms of content?", Adams testified, "[t]hat's true." (Tr. Vol. III p. 403, l. 11-13). Similarly, the probability is that Icke will succeed on the merits of all of the state law causes of action.

The Court finds that there are no other adequate remedies at law available for plaintiffs to pursue. Adams has intentionally failed to comply with the prior court order to deposit funds into escrow and has failed to provide discovery to Icke, even though ordered to do so by this Court. Without receiving further injunctive relief, Icke's books will not be properly printed and distributed; Adams will execute his stated plan to continue to infringe Icke's copyrights and Adams will likely continue to misappropriate Icke's money without the ability to repay as much as a million dollars heretofore misappropriated. The right to recover by Icke against Defendants in any lengthy legal proceeding will likely result, in the absence of injunctive relief, in no effective legal relief at all.

Finally, the public interest will be served in issuing injunctive relief in preventing Adams from continuing to infringe Icke's copyrights and in preventing Adams from continuing to misappropriate money belonging to Icke. The public interest is always served in protecting legitimate interests from predatory practices.

## III. CONCLUSION

Icke is entitled to preliminary injunctive relief. The Court has concluded that Icke has proved the threat of irreparable harm to himself; the state of balance between this harm and the injury that granting the injunction will inflict on Defendants strongly favors granting injunctive relief; Icke has proved there is a high likelihood of success on the merits. Icke has no legal remedy to prevent Adams from ordering the printing and distribution of Icke's copyrighted works, and to prevent Adams from continuing to misappropriate Icke's money. The Court has also found that the public interest will be served by granting the requested preliminary injunction. All of the *Dataphase* factors have been satisfied.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED,** that from and after this date, Defendants Royal Adams, Bridge of Love USA, under the control of Adams, and Royal Personnel, Inc., and all persons and entities acting in concert and participation with them who receive actual notice of this preliminary injunction by personal service or otherwise, are hereby enjoined from any copying, printing, advertising, distributing, selling or offering of sale or otherwise alienating the copyrighted works as evidenced by the Certificates of Registration of United States Copyrights in the name of David Icke, or any other written or oral works of David Icke in any format or medium.

Defendants are further ordered to immediately deposit in an escrow account, with the Law Firm of Greensfelder, Hempker and Gale, P.C., titled Missouri Lawyer Trust Account Foundation Greensfelder, Hampker and Gale, P.C., held with the UMB Bank, already established, all moneys received by them, or being held by others on the behalf of any Defendant, from the sale, printing, copying or distribution of any of the works of David Icke.

Defendants shall immediately instruct Bookworld to direct payment of all moneys received by them resulting from the sale or distribution of David Icke's works, or hereafter received by them, to the above mentioned escrow account, irrespective of the date from which any moneys have been received by Bookworld, whether before or after the date of this injunction, and Defendants shall instruct Patterson Printing and U.F.O. Video to produce no more of David Icke's works, except upon the written instruction of only David Icke.

Defendants shall provide immediate access and instruct Patterson Printing, U.F.O. Video and Bookworld to provide to David Icke access to all of their records, books, accounts and documents, in whatever, form, written, voice, or electronic, and allow copying, at David Icke's expense, of all such records, books, accounts and documents, relating to printing, advertising,

distributing, offering for sale, and sale of David Icke's works, through counsel of record for Plaintiffs, and Defendants shall notify Bookworld that no orders for distribution of David Icke's works shall be allowed except on written order of David Icke, and, at his election, David Icke may remove all of his works from the possession of Bookworld.

Defendant Royal Adams is ordered to immediately deliver to Plaintiffs' counsel, Mary Ann Wymore, all computer discs or other medium relating to David Icke's works for use by David Icke in connection with the copying, printing, advertising, distributing, offering for sale and sale of David Icke's works.

Defendants are ordered to instruct Patterson Printing, U.F.O. Video and Bookworld to deliver, at David Icke's request, all computer discs or other medium relating to David Icke's works for use by David Icke in connection with the copying, printing, advertising, distributing, offering for sale and sale of David Icke's works.

David Icke may, at his election, continue to sell or offer to sell, copy, print, and advertise any of his works in the United States or in any other country, and he shall maintain, until the termination of this case, accurate records of all sales of his books from and after this date and provide this Court with an accurate annual accounting of all sales of his works from and after this date.

David Icke may, at his election, continue to order printing of his works through Patterson Printing and may, at his election, continue to distribute his works through Bookworld, and any sales of David Icke's works through Bookworld shall be deposited in the above-referenced escrow account.

**IT IS FURTHER ORDERED,** that Royal Adams shall appear in this Court on the 20th day of April, 2007, at **<u>10:00 a.m.</u>** and show cause why he should not be held in civil contempt of

this Court for his failure to promptly deposit into an escrow account, all sums previously ordered by this Court in its December 14, 2006 Order to be so deposited and as to why he has not complied with this Court's prior order to provide discovery material to Plaintiffs.

So Ordered this 5th Day of April, 2007.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE