UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID ICKE and BRIDGE OF LOVE, UK,   )
   )
       Plaintiffs,   )
   )
     vs.   )      Case No. 4:06CV00685 ERW
   )
ROYAL ADAMS, et al.,   )
   )
       Defendants.   )

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiffs David Icke and Bridge of Love, UK's

Motion for Summary Judgment [doc. #60].

## I.    PROCEDURAL BACKGROUND

On April 24, 2006, Plaintiffs David Icke and Bridge of Love, UK (collectively,

"Plaintiffs") filed suit against Defendants Royal Adams, Bridge of Love, and Royal Personnel, Inc.

(collectively, "Defendants"). Plaintiffs initially brought the following causes of action: declaratory

judgment, breach of contract, unjust enrichment, conversion, breach of the covenant of good faith

and fair dealing, accounting, permanent injunction, tortious interference with economic advantage

and/or business relations, and tortious interference with contract. Plaintiffs filed an amended

complaint on May 23, 2006 and asserted an additional cause of action: copyright infringement.

These causes of action all arose out of a contractual relationship that existed between Mr. Icke

and Mr. Adams.

On June 9, 2006, this Court entered an Agreed Temporary Restraining Order, and

subsequently extended it several times, through December 12, 2006. This initial temporary

restraining order prohibited Defendants from selling or advertising works by Mr. Icke, required that all payments for works by Mr. Icke be placed in an escrow account, and required that Plaintiffs be given access to certain documents and records. On December 7, 8, and 12, 2006, the Court held a preliminary injunction hearing. At the end of that hearing, the Court made some minor modifications to the existing temporary restraining order and extended it once again. Ultimately, the Court entered a preliminary injunction on April 5, 2007, and, in the same Order, ordered Defendant Royal Adams to show cause why he should not be held in civil contempt of court for his failure to comply with the escrow account and discovery terms of the Court's previous Order.

On the same day that the Court issued the Preliminary Injunction, Defendants filed counterclaims against Plaintiffs. They alleged that Mr. Icke breached the contract between the parties, made fraudulent representations in inducing Mr. Adams to enter into the contract, and intentionally interfered with Defendants' business relationship with other authors.

Plaintiffs filed the pending Motion for Summary Judgment on September 5, 2008, and on September 29, 2008, the Court noted that Defendants had failed to file a response to Plaintiffs' Motion. The Court ordered Defendants to show cause, no later than October 3, 2008, why Plaintiffs' Motion should not be granted. Defendants failed to respond to the Court's show cause order, causing the Court to again order them to show cause, this time no later than October 30, 2008, why Plaintiff's Motion should not be granted. On October 29, 2008, Defendants filed their Response in Opposition.

## II.  BACKGROUND FACTS

The Court begins by noting that, in a Motion for Summary Judgment, the Local Rules require the nonmoving party to "include a statement of material facts as to which the party contends a genuine issue exists," and to provide specific references to the record for those matters contested by the nonmoving party.  Local Rule 7-4.01(E).  Any matters that are not specifically controverted by the nonmoving party are deemed admitted for the purposes of summary judgment.  *Id.*  Local rules such as this are implemented in order to prevent district courts from having to "scour the record looking for factual disputes."  *Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003).

In addition, Federal Rule of Civil Procedure 56(e) requires the nonmoving party to respond to a Motion for Summary Judgment, but "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial."  This requires the nonmoving party to present "'more than a scintilla of evidence.'"  *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 812 (8th Cir. 2008) (quoting *Williams v. City of Carl Junction*, 480 F.3d 871, 873 (8th Cir. 2007)).  The district court "'is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim.'"  *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) (quoting *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1069 (8th Cir. 2005)).

Defendants' Response to Plaintiffs' Motion for Summary Judgment apparently does not include a statement of material facts at all, let alone one that properly conforms to the requirements of the Local Rules and the Federal Rules of Civil Procedure.  Instead, the Response

merely copies, virtually verbatim, Plaintiffs' Motion for Summary Judgment, adding a few statements that appear to be Defendants' argument in opposition of summary judgment. Of these added statements, not a single one includes a citation to the record to support the proposition stated. Further, Defendants fail to cite to a single state or federal law to support their opinion. As a result, the Court will deem admitted each fact contained within Plaintiffs' Statement of Uncontroverted Material Facts in Support of Plaintiffs' Motion for Summary Judgment [doc. #62] and the Court's recitation of the facts will come from this Statement.

Plaintiff David Icke is a well-known author of books distributed and sold throughout the United States and in the United Kingdom. Mr. Icke is the sole author and contributor to books entitled *Alice in Wonderland and the World Trade Center Disaster*; *And The Truth Shall Set You Free*; *And The Truth Shall Set You Free – 21st Century Edition*; *The Biggest Secret*; *Children Of The Matrix*; *Tales From The Time Loop*; *I Am Me, I Am Free*; *Infinite Love Is The Only Truth: Everything Else Is Illusion* (collectively referred to hereinafter as the "Works").

Before 1998, Mr. Icke had not published any of the Works within the United States. Defendant Royal Adams approached Mr. Icke at a conference and identified himself as someone who could assist him with the printing and distribution of his Works within the United States. Mr. Adams represented to Mr. Icke that he was engaged in the business of representing authors in connection with the printing and distribution of their books.

Mr. Icke entered into an oral agreement with Mr. Adams in 1998 (the "Agreement"). The Agreement provided that Mr. Adams would arrange for the printing and distribution of the Works in the United States and would reprint the Works to keep warehouses stocked. In return, Mr. Adams would keep 25% of the net profits from sales of the Works and pay the

remaining 75% of the net profits to Mr. Icke.  The Agreement did not transfer right, title or

interest in or to any of the Works to Mr. Adams or any of the Defendants.  Mr. Icke retains sole

possession and ownership of the copyrights and Mr. Adams does not have any ownership interest

in any of the copyrights.  Mr. Adams had no input into the production of the Works; the

Agreement merely permitted him to act as an agent to arrange for the printing and distribution of

the Works.  At all relevant times since the Agreement's inception, it was the intent and

understanding of Mr. Adams and Mr. Icke that all rights relating to the Works would be owned

by Mr. Icke and that the Defendants, or any entity affiliated with or owned by Mr. Adams, would

have no ownership rights to the Works.  Furthermore, Mr. Icke has never executed any document

effecting a transfer of rights to Mr. Adams, or any entity affiliated or owned by him, including

Bridge of Love and Royal Personnel, Inc.

Mr. Adams arranged for all copies of the Works to be printed, first by Bertlesmann and

then by Patterson Printing, in the United States for distribution both in the United States (by Mr.

Adams) and outside of the United States (by Mr. Icke).  Mr. Adams also arranged for the Works

to be distributed and sold in the United States by Bookworld Companies.  Bridge of Love, UK is

responsible for the distribution and sale of the Works throughout Europe and through a website

owned and operated by Bridge of Love, UK

Given that printing costs are less expensive in the United States than in the United

Kingdom, all printing for Mr. Icke's books was done in the United States by Patterson.  The

expense of securing an inventory in the United Kingdom for distribution by Bridge of Love, UK

(including costs or purchasing and shipping the inventory) was incurred solely by Mr. Icke, and

did not in any way involve the Defendants.  Similarly, website orders for the Works were placed

by Bridge of Love, UK directly with Bookworld, the distributor of the Works. Bookworld filled website orders directly and invoiced Bridge of Love, UK for 20% of the cover price of the books, with shipping paid by the customer. When the full cost of the book plus shipping was received by Bridge of Love, UK from the customer, it remitted all invoiced amounts to Bookworld. The Defendants had no involvement with respect to the distribution of the Works via Internet sales.

During the first two years of the agreement, Mr. Adams represented to Mr. Icke that the U.S. operations were struggling, and that Mr. Adams was keeping up by charging expenses to his credit card. Believing these assertions, Mr. Icke began sending any requests for foreign translations of the books to Mr. Adams to allow more money to flow through the U.S. operation.

In mid-2005, Mr. Icke requested that Defendants supply to him for review the books and records related to the printing and distribution of the Works, and the revenues derived therefrom, throughout the term of the Agreement. Based upon a limited review by Mr. Icke's accountant of the books and records relating to the first ten months of 2005, it became abundantly clear to Mr. Icke that Mr. Adams was not remitting the full 75% of net profits to which Mr. Icke was entitled under the Agreement. Mr. Icke requested an opportunity to review all books and records related to the printing and distribution of the Works from the inception of the Agreement, but Mr. Adams refused to provide him with access. When Mr. Icke inquired about the money received from foreign publishers, Mr. Adams stated that the money was minimal, however Mr. Icke later learned that the French publisher alone had remitted at least $64,000 to Mr. Adams for Mr. Icke's books. Moreover, Mr. Adams contacted the printer, Patterson, and the distributor, Bookworld, and instructed them not to provide Mr. Icke with any information relating to his Works.

Shortly after Mr. Icke's request to review the books and records, on or about March 16, 2006, Mr. Adams advised Mr. Icke that he was not obligated to remit monies derived from the sale of the Works to Mr. Icke. Mr. Adams claimed that he was the "exclusive publisher" of the Works and stated that he could take previously published books authored by Mr. Icke, as well as any new book authored by him, and print and distribute them in his sole discretion. Mr. Adams testified, however, that he did not assert any copyright interest in the Works. Mr. Adams continued to print and sell the Works subsequent to March 16, 2006, but he did not remit Mr. Icke's share of the monies.

From 1998 through February 2006, Mr. Adams did not pay Mr. Icke the full 75% of the net profits from sales of the Works.[1] In light of Mr. Adams's material breaches of the Agreement, by letter dated April 10, 2006, Mr. Icke terminated the Agreement (the "Notice of Termination"), effective immediately. In the Notice of Termination, Mr. Icke demanded that, by April 18, 2006, Mr. Adams, and any entity affiliated with or owned by him: (1) cease all activities related to the printing, distribution and sale of the Works, or any other products containing or incorporating the Works, and confirm such cessation in writing to Mr. Icke's counsel; (2) immediately provide Mr. Icke's counsel with copies of all books and records related to the printing, distribution and sales of the Works in the United States from 1998 to the present; (3) remit to Mr. Icke's counsel a

---

[1]This is one of the facts that Defendants apparently contest. In their Response to Plaintiff's Motion for Summary Judgment, they break their pattern of repeating the numbered statements from Plaintiff's Motion for Summary Judgment to state, "From 1998, until February 2006, Adams did pay Icke even though were [sic] no profits and great debt." Defendants, however, do not provide a specific citation to the record to support this statement, in violation of the Local Rules of this Court and the Federal Rules of Civil Procedure. Therefore, the Court will deem admitted Plaintiffs' statement that "[f]rom 1998, until February 2006, Adams did not pay Icke the full 75% of the net profits from sales of the Works."

check, payable to David Icke, in the amount equal to 75% of net profits derived from the Works since March 2006; and (4) deliver to Mr. Icke's counsel all remaining inventory of the Works. Quite surprisingly, Defendants did not acknowledge receipt of the Notice of Termination until April 24, 2006, when Defendants' attorney, Robert Cox, Esq., contacted Mr. Icke's counsel and reiterated that Defendants intended to continue selling the Works, notwithstanding the Notice of Termination and Mr. Icke's clear right to determine who can print and distribute them.

By letters dated April 24, 2006, Mr. Icke notified Patterson and Bookworld of his termination of the Agreement. Notwithstanding having been put on notice of the termination, Bookworld continued to sell the Works on its company website and to distribute the Works throughout the United States. In a letter dated April 26, 2006, Patterson took the position that it recognized Mr. Adams as the owner of the Works and the party authorized to direct the printing of the Works and refused to return computer discs and other materials relating to the Works to Mr. Icke.

Mr. Adams claimed to be Bridge of Love, USA solely, and expressed his plan to cease all payments to Mr. Icke, shut down the website, and not provide Bridge of Love, UK with shipments. Mr. Icke testified at the Preliminary Injunction Hearing that Mr. Adams's threats became realities soon after they were made. As a result of Defendants' unauthorized use of the Works, Plaintiffs have been and continue to be irreparably harmed in that Mr. Icke's income has been severely compromised, and has caused him to be unable to finance research on additional books or to finance his current operations. Additionally, Defendants' improper wresting of control of the Works from Mr. Icke has caused him irreparable harm in that he cannot control the printing, distribution and sale of the Works to the general public. Similarly, Patterson's and

Bookworld's failure to cease all printing and distribution of the Works, return all materials relating to the Works to Mr. Icke, and remit monies owed to Mr. Icke from the sale of the Works, have also irreparably harmed Plaintiffs in that Plaintiffs cannot control the printing, distribution and sale of the Works to the general public or engage a new printer or distributor.

Mr. Icke has not received any income from the sales of his Works in the United States or with respect to foreign royalties, since in or about February 2006. Michael Wedlock, an accountant for Mr. Icke, testified at the Preliminary Injunction Hearing that a total of at least $953,000 was not paid to Mr. Icke by Mr. Adams from August 2001 through May 31, 2006. During that time, a net profit of approximately $1,622,000 should have been divided among Mr. Icke and Mr. Adams per the agreement. Thus, the money that Mr. Adams should have paid Mr. Icke was approximately $1,200,000. Mr. Adams paid Mr. Icke only $263,505, resulting in a shortfall of approximately $953,000.

The business records that were provided to Mr. Wedlock had not been well-kept and were incomplete. Moreover, Mr. Adams admitted that he mismanaged Mr. Icke's share of the profits and commingled the business' money with his personal money. Mr. Adams spent Mr. Icke's share of the profits on items such as his home sewer bill ($310), production and recording costs for a CD of his music ($3,900), music lessons ($4,633), renovations to his home ($35,000), spiritual advice ($11,000), a fireplace for his home ($6,722), his child support obligations ($9,583), his mortgage ($24,808), his credit card payments ($155,298), an irrigation system for his home ($3,804), his Harley-Davidson motorcycle ($12,777) and a car lease ($7,245).

This Court, by Orders of June 9, 2006, and December 14, 2006, directed Defendants to cause escrow monies to be deposited into a trust account. On April 17, 2007, Plaintiffs' counsel

received a check for $100,000 from Bookworld. No accounting accompanied the check; therefore, Plaintiffs' counsel did not know what that amount represented. Mr. Adams deposited no money into the escrow account from any trust accounts and failed to comply with this Court's Orders by not providing complete books, records, and monies to Plaintiffs. Without income from sales of his Works, Mr. Icke is facing extreme financial hardship and is unable to produce additional books, films and other projects.

Bookworld ceased operations in September 2007. Prior to this date, Bookworld provided to Mr. Adams monthly summaries of all of Mr. Icke's books sold and distributed through Bookworld. However, Bookworld did not produce these summaries to Plaintiffs. An AtlasBooks representative also confirmed that Bookworld's inventory of Mr. Icke's books had been transferred to AtlasBooks and was in the system under the name Royal Adams and/or Bridge of Love. AtlasBooks did not assume all of Book World's inventory, but signed up publishers of Bookworld for distribution services with Atlas Books. The president of AtlasBooks further confirmed that any transfer of inventory would have had to be authorized by an author's agent as AtlasBooks was not automatically taking over Bookworld's accounts.

Defendant Adams was indicted on charges of, *inter alia*, tax evasion and filing of false income tax statements in connection with the tax years 2001 through 2003. On or about June 8, 2008, Adams entered into a plea agreement with the United States, pursuant to which he pleaded guilty to three counts of filing false tax returns.[2]

---

[2]Defendant claims that his indictment on charges of tax evasion and filing false income tax statements is irrelevant to the issues presented in this case, "since the taxes owed by Royal Adams do not relate to any assets owned by Bridge of Love." However, the Court disagrees with Defendants' assertion. The charges of tax evasion and filing false income tax statements were based, in large part, on the allegation that Mr. Adams failed to properly report his income. A

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, if the nonmoving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in

_____

portion of this income was money from the sale of Mr. Icke's books, 75% of which should have been delivered to Mr. Icke.

his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the nonmoving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e)(2). When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the nonmoving party must show there is sufficient evidence favoring the nonmoving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## IV. DISCUSSION

## A. DECLARATORY JUDGMENT

Plaintiffs seek a declaratory judgment that: (1) the Agreement has been terminated, effective April 10, 2006; (2) Mr. Icke is the owner of all right, title and interest in and to the Works; and (3) Defendants, or any other entity affiliated or owned by Mr. Adams, have no rights in and to the Works and cannot engage in any printing, distribution or sales activities related to the Works. The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party" in a "case of actual controversy." 28 U.S.C. § 2201. A case of actual controversy is one in which there is "'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Diagnostic Unit Inmate Council v. Films Inc.*, 88 F.3d 651, 653 (8th Cir. 1996) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941)). In determining whether to exercise jurisdiction under the Declaratory Judgment Act, the Court should first ask whether a declaratory judgment would "serve a useful purpose in clarifying and settling" the legal dispute. *Alsager v. Dist. Court of Polk County, Iowa*, 518 F.2d 1160, 1162 (8th Cir. 1975). Second, the Court should ask whether a declaratory judgment would "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Id.*

Defendants admitted that Mr. Icke terminated the Agreement that existed between himself and Mr. Adams by letter on April 10, 2006. Further, they did not dispute that the Notice of Termination was effective immediately. Establishing these facts by declaratory judgment would help clarify and settle this legal dispute and would terminate the uncertainty that underlies these proceedings because Mr. Adams has, seemingly inexplicably, declared that he is the "exclusive publisher" of the Works, that he has rights to all books authored by Mr. Icke, and that he solely is Bridge of Love, USA. He maintained this image to the printer and distributor after the

Agreement between the men was terminated. Defendants admitted that the printing and distribution did not stop after the Agreement was terminated but Mr. Icke has not received any income from the sales of his Works in the United States or with respect to foreign royalties. It is clear that this behavior will continue unless the Court intervenes, and Defendants have not set forth any facts that would suggest otherwise. A declaratory judgment that the Agreement has been terminated, effective April 10, 2006, is proper.

Defendants have admitted, by failing to respond, that the Agreement did not transfer any right, title or interest in or to any of the Works to any of the Defendants. They also admitted that Mr. Icke retains sole possession and ownership of the copyrights. Establishing these facts by declaratory judgment would help clarify and settle this legal dispute and would terminate the uncertainty that underlies these proceedings because, despite their admission, Mr. Icke claims that he can take any book authored by Mr. Icke, either in the past or in the future, and print and distribute it in his sole discretion. It is clear that Mr. Icke and the other Defendants need clarification that they do not, in fact, have any rights to Mr. Icke's copyrights. Defendants have not identified a genuine issue of material fact regarding the necessity of a declaratory judgment and, thus, a declaratory judgment that Mr. Icke is the owner of all right, title and interest in and to the Works is proper.

Defendants admitted that Mr. Icke's Notice of Termination demanded that they cease all printing, distribution and sales activities with respect to the Works, that they return all remaining inventory to Mr. Icke, and that they remit Mr. Icke's 75% share of net profits earned after termination of the Agreement. Establishing by declaratory judgment that Defendants have no right to print, distribute or sell the Works would help clarify and settle this legal dispute and

would terminate the uncertainty that underlies these proceedings because Defendants have admitted, by failing to respond, that Mr. Adams continued to print and sell the Works after the termination of the Agreement and that Mr. Adams did not remit Mr. Icke's share of the monies subsequent to March 16, 2006. Mr. Adams has no right to continue in this manner and he apparently needs to be legally restrained, as Defendants have not made any argument that would suggest that their behavior will change. A declaratory judgment that Defendants, and any other entity affiliated or owned by Mr. Adams, have no rights in and to the Works and cannot engage in any printing, distribution or sales activities related to the Works is proper.

**B.    COPYRIGHT INFRINGEMENT**

Plaintiffs allege that Defendants engaged in impermissible copyright infringement. "To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of a work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 941 (8th Cir. 1992).

As to the first element, Defendants admitted, by failing to respond, that Mr. Icke retains sole possession and ownership of the copyrights. Thus, the only issue is whether those copyrights are valid. Holding a certificate of registration issued within five years of the first publication is prima facie evidence of a valid copyright; however, this presumption is rebuttable. 17 U.S.C. § 410(c). Plaintiffs attached to their Amended Complaint copyright registrations of all of the works at issue in this case, four of which were issued within five years of the first publication: *Alice in Wonderland and the World Trade Center Disaster*; *And The Truth Shall Set You Free – 21st*

*Century Edition*; *Tales From The Time Loop*; *Infinite Love Is The Only Truth: Everything Else Is Illusion*. These four works are valid, as Defendants have not rebutted the presumption.

With respect to the remaining four works, the fact that the registrations were made more than five years after the first publication does not render the registrations invalid. *See* 17 U.S.C. § 410 (c); *Thimbleberries, Inc. C & F Enters., Inc.*, 142 F. Supp. 2d 1132, 1137 (D. Minn. 2001). 17 U.S.C. § 102(a) provides that "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." Applying this standard, it is clear that the remaining four works are subject to valid copyrights. Defendants admitted that Mr. Icke is the sole author and contributor to the books and that his works are "original and creative." Further, the works at issue are books, which by necessity are fixed in a tangible medium of expression. Thus, it is clear that Plaintiffs own valid copyrights for the works at issue.

In regard to the second element required to establish copyright infringement, Plaintiffs have demonstrated that Defendants copied portions of the original works of Mr. Icke. The Agreement between the parties permitted Mr. Adams to act as an agent for Plaintiffs and to arrange for the printing and distribution of the works. Defendants admitted, by failing to respond, that the Agreement did not transfer any ownership rights of the works to Defendants. They also admitted that Mr. Icke terminated this Agreement by letter on April 10, 2006, but that Mr. Adams continued to print and sell the books after this date, without remitting any of the profits to Mr. Icke. This unauthorized use is more than sufficient to meet the second element.

Plaintiffs have made the required showing and Defendants have not demonstrated that any issue of genuine material fact exists regarding Plaintiffs' cause of action for copyright infringement. Plaintiffs are entitled to summary judgment on this claim.

## C.     BREACH OF CONTRACT

Plaintiffs allege that Defendants breached the contract that existed between the parties by failing to properly turn over 75% of the net profits, as required under the terms of their Agreement.  To establish breach of contract, Plaintiffs must establish "(1) the existence of a valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages." *Nat'l Sur. Corp. v. Prairieland Constr. Inc.*, 354 F. Supp. 2d 1032, 1039 (E.D. Mo. 2004).

Defendants admitted, by failing to respond, that Mr. Icke and Mr. Adams entered into an oral agreement in 1998, which provided that Mr. Adams would arrange for the printing and distribution of the Works.  The Agreement further provided that Mr. Adams would keep 25% of the net profits from sales of the Works, and pay the remaining 75% to Mr. Icke.  Defendants also admitted that from 1998 until February 2006, Mr. Adams did not pay the full 75% of the net profits from sales of the Works, as required under the Agreement.  Of course, as a result of Mr. Icke not receiving his full 75% share, he suffered damages in the form of monetary loss.  Specifically, Defendants admitted, by failing to respond, that Mr. Adams should have paid at least $1,200,000.00 to Mr. Icke between 1998 and February 2006, but that he only paid $263,505.00.  Thus, Mr. Icke suffered a minimum loss of $953,000.00.[3]  As a result of this deficit, Mr. Icke has been unable produce new projects.

---

[3]The Court uses the word "minimum" because the exact amount of the loss is unknown at the present time.  Mr. Adams has been indicted on charges of tax evasion and filing false income tax statements.  Because these charges were based on Mr. Adams's failure to properly report his income, it is possible that some of his non-reported income should be attributed to Mr. Icke.

It is clear from these facts alone that Mr. Adams breached the oral contract that existed between himself and Mr. Icke.  Defendants have failed to identify a genuine issue of material fact and Plaintiffs are entitled to summary judgment on this claim.

**D.**     **UNJUST ENRICHMENT**

Plaintiffs allege that Defendants have been unjustly enriched by retaining large sums of money that rightfully belong to Plaintiffs.  In order to prevail on an unjust enrichment claim, Plaintiffs must establish: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention of the benefit under such circumstances that it would be inequitable for defendant to retain the benefit without paying the value thereof." *Graves v. Berkowitz*, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000) (citation omitted).

In this case, it is uncontroverted that Mr. Icke retains sole possession and ownership of the copyrights for the Works.  By agreement, Mr. Icke gave Mr. Adams permission to print and distribute the Works in the United States.  In exchange, Mr. Adams was to remit 75% of all net profits earned from sales of the Works to Mr. Icke.  Defendants admitted that Mr. Adams took advantage of this agreement by arranging for the printing and distribution of the Works.  However, he did not remit 75% of the net profits, as he had previously agreed to do.  It would be inequitable to allow Mr. Icke and the other Defendants to retain profits that rightfully belong to Mr. Icke, the author of and sole contributor to the Works.

Plaintiffs have proven all of the elements of a cause of action for unjust enrichment and Defendants have not demonstrated that a genuine issue of material fact exists as to any of those elements.  Thus, Plaintiffs are entitled to summary judgment on this claim.

## E.    CONVERSION

Plaintiffs allege that they are entitled to a judgment for conversion.  The tort of conversion is defined as "the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049, 1053-54 (8th Cir. 2005) (quoting *Bell v. Lafont Auto Sales*, 85 S.W.3d 50, 54 (Mo. Ct. App. 2002)).  One may prove conversion "(1) by showing a tortious taking; (2) a use or appropriation by the defendant indicating a claim or right in opposition to the owner; or (3) a defendant's refusal to give up possession on demand." *Kennedy v. Fournie*, 898 S.W.2d 672, 678 (Mo. Ct. App. 1995).  Regardless of which method of proof is used, the party asserting conversion "must show it had title to, or a right of property in, and a right to the immediate possession of the property concerned at the alleged date of conversion." *Id.* (emphasis omitted).

It is clear from the facts of this case that Mr. Adams converted profits from Mr. Icke by using Mr. Icke's rightful share of the net profits in a manner that indicated a claim in opposition to the owner.  Defendants admitted, by failing to respond, that Mr. Adams spent Mr. Icke's share of the profits on items such as his home sewer bill, production and recording costs for a CD of his music, music lessons, renovations to his home, spiritual advice, a fireplace for his home, child support obligations, mortgage payments, credit card payments, an irrigation system for his home, a Harley-Davidson motorcycle, and a car lease.  Intentionally spending money that rightfully belongs to another individual certainly establishes that the person is attempting to assert a claim in opposition to the true owner's rights.

Further, it is undisputed that Mr. Icke had a right to the immediate possession of his share of the net profits. Defendants admitted, by failing to respond, that Mr. Icke retains sole possession and ownership of the copyrights. Mr. Icke granted Mr. Adams the limited right to use the copyrights for the printing and distribution of Mr. Icke's Works in the United States. Defendants admitted that the terms of their agreement provided that Mr. Adams could retain 25% of the net profits, but that he was to pay the remaining 75% of the net profits to Mr. Icke.

Plaintiffs have made the required showing and Defendants have not demonstrated that any issue of genuine material fact exists regarding Plaintiffs' cause of action for conversion. Plaintiffs are entitled to summary judgment on this claim.

## F. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs allege that Defendants breached the covenant of good faith and fair dealing, which is implied in every contract. *See Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. 1998). In order to prove a violation of the covenant of good faith and fair dealing, "it is not enough for a plaintiff to show that a party invested with discretion made an erroneous decision," rather "the plaintiff must show that the party exercised its discretion 'in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract.'" *BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007) (quoting *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 45 (Mo. Ct. App. 2002)) (alterations in original).

The uncontroverted facts show that Mr. Adams both exercised his rights under the Agreement in a way that evades the spirit of the transaction and denied Mr. Icke the expected benefit of the contract. First, Mr. Adams evaded the spirit of the transaction by using his limited

access to Mr. Icke's copyrights to claim that he was the "executive publisher" of the Works and that he had the right to print and distribute all previously published and forthcoming books authored by Mr. Icke. Mr. Adams was clearly attempting to take advantage of his established relationship with Mr. Icke to usurp rights that Mr. Icke lawfully possesses. This type of behavior is well beyond the imaginable scope of the contract and offends every sense of justice.

Mr. Adams also denied Mr. Icke the expected benefit of the contract. As this Court has already established several times with respect to Plaintiffs' other causes of action, Mr. Icke was entitled to receive 75% of the net profits under the terms of the Agreement. This was the benefit he was to receive in exchange for granting Mr. Adams the right to print and distribute his Works in the United States. By retaining more than the 25% that he was entitled to retain, Mr. Adams denied Mr. Icke the expected benefit of the contract.

Plaintiffs have proved all of the elements of a cause of action for breach of the covenant of good faith and fair dealing and Defendants have not demonstrated that a genuine issue of material fact exists as to any of those elements. Thus, Plaintiffs are entitled to summary judgment on this claim.

## G. ACCOUNTING

Plaintiffs seek an accounting of all revenues received by Defendants which were derived from the printing and distribution of Mr. Icke's Works. "Four elements are required to establish equitable jurisdiction for an accounting: the need for discovery, the complicated nature of the

accounts, the existence of a fiduciary or trust relationship, and the inadequacy of legal remedies." *Tobias v. Korman*, 141 S.W.3d 468, 474 (Mo. Ct. App. 2004).

There is clearly a need for discovery in this case. Mr. Adams has admitted that he mismanaged Mr. Icke's share of the profits and commingled the business's money with his personal money. However, Mr. Adams has consistently refused to provide Mr. Icke access to the books and records related to the Works. Mr. Adams also contacted the printer and distributor and instructed them not to provide any information about the Works to Mr. Icke, so Plaintiffs were unable to obtain records from them. Further, the accounts at issue are complicated in nature because the records have not been well-kept and are incomplete; additionally, the possibility that some of the net profits were never reported suggests that complications are likely. Plaintiffs need access to these books and records to be able to determine the exact amount of Mr. Icke's losses. Defendants' unwillingness to comply with this Court's previous Orders requiring them to turn over the books and records is definitive proof that legal remedies are inadequate to resolve this problem.

Finally, it is clear that Mr. Icke and Mr. Adams maintained a fiduciary or trust relationship. Under Missouri law, a fiduciary relationship exists when "'a special confidence [is] reposed in one who in equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence.'" *Dairy Farmers of Am. v. Travelers Ins. Co.*, 292 F.3d 567, 572 (8th Cir. 2002) (quoting *Vogel v. A.G. Edwards & Sons, Inc.*, 801 S.W.2d 746, 751 (Mo. Ct. App.)) (alteration in original). Under their Agreement, Mr. Icke entrusted Mr. Adams with his copyrighted Works for the sole purpose of printing and distribution within the United States. Mr. Icke trusted that Mr. Adams would act in his best interests and

would turn over the 75% of the net profits he was entitled to receive under the Agreement. Thus, it is clear that a fiduciary relationship existed between the two men.

Defendants have failed to demonstrate that a genuine issue of material fact exists that would call into doubt Plaintiffs' argument that an accounting is necessary in this case. As a result, an accounting of all revenues received by Defendants which were derived from the printing and distribution of Mr. Icke's Works is proper in this case.

## H.    PERMANENT INJUNCTION

Plaintiffs seek a permanent injunction enjoining Defendants from (1) engaging in any activities related to the Works; (2) receiving any revenues and net profits with respect to the Works; and (3) exploiting the Works in any manner. "The Copyright Act specifically authorizes a federal court to 'grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.'" *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967 (8th Cir. 2005) (quoting 17 U.S.C. § 502(a)). In determining whether to grant a permanent injunction, the Court must consider three factors: (1) the threat of irreparable harm to the moving party; (2) the balance of harm between this harm and the harm suffered by the nonmoving party if the injunction is granted; and (3) the public interest." *Id.*

As previously established, Mr. Adams has continued to print and distribute the Works, even after Mr. Icke terminated the Agreement that existed between the two. Defendants admitted that the April 2006 Notice of Termination demanded that Mr. Adams cease all activities related to the Works. However, as recently as October 2007, after the issuance of this Court's Preliminary Injunction, Mr. Adams was still holding himself out as a representative of Plaintiffs by authorizing the transfer of Bookworld's inventory of the Works to Atlas Books. It is clear that Defendants

are not the slightest bit concerned about trampling on Plaintiffs' rights and that the likelihood of future irreparable harm is significant. A permanent injunction would cause no harm to Defendants, because preventing Defendants from continuing their unlawful activity does not interfere with any exercise of a lawful right, and protecting intellectual property rights is certainly in the public interest.

Plaintiffs are entitled to a preliminary injunction, as Defendants have presented no genuine issue of material fact suggesting to the contrary.

## I. TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE, BUSINESS RELATIONS, AND/OR CONTRACT[4]

Plaintiffs allege that Defendants tortiously interfered with Plaintiffs' business and business relations when Mr. Adams instructed Bookworld not to fill orders for Mr. Icke's books placed through his website. Under Missouri law, a claim of tortious interference with a contract or business expectancy requires proof of: "(1) a contract or business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 316 (Mo. 1993).

First, Defendants admitted, by failing to respond, that Plaintiffs relied on Bookworld to fill on-line orders for Mr. Icke's books that were made through Bridge of Love, UK's website. A contractual relationship existed whereby Bookworld would fill the website orders directly and

---

[4]In their First Amended Complaint, Plaintiffs list Tortious Interference with Economic Advantage and/or Business Relations and Tortious Interference with Contract as two separate causes of action. In their Memorandum in Support of their Motion for Summary Judgment, however, Plaintiffs group the two causes of action together and address them all with one analysis. The Court will follow Plaintiffs' lead and analyze the causes of action at one time.

invoice Bridge of Love, UK for 20% of the cover price of the books, with shipping paid by the customer.  Mr. Adams was apparently aware of this arrangement because Defendants admitted that after Mr. Adams and Mr. Icke's Agreement was terminated, Mr. Adams claimed to be Bridge of Love, USA solely and informed Mr. Icke that he planned to shut down the website and not provide Bridge of Love, UK with shipments.  Mr. Icke testified under oath that Mr. Adams's threats became realities shortly after they were made.  Further, the fact that Mr. Adams sent an email outlining his plan to shut down the website and not provide Bridge of Love, UK with shipments prior to acting on this plan demonstrates that Mr. Adams's interference was intentional. There can be no legitimate justification for Mr. Adams's behavior, as he had no right or privilege to control the distribution of the Works.  Finally, it is clear that Plaintiffs suffered monetary damages as a result of orders on the website not being filled.

Plaintiffs have proven all of the elements of a cause of action for tortious interference and Defendants have not demonstrated that a genuine issue of material fact exists as to any of those elements.  Thus, Plaintiffs are entitled to summary judgment on this claim.

**J.	DEFENDANTS' COUNTERCLAIMS**

**1.	<u>Breach of Contract</u>**

In the first of their counterclaims, Defendants allege that Mr. Icke breached the contract that existed between Mr. Adams and himself by ceasing all payments to Mr. Adams, in breach of the duties set down in the agreement.  As previously stated, to prevail on a breach of contract

claim, a party must prove: "(1) the existence of a valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages." *Nat'l Sur. Corp. v. Prairieland Constr. Inc.*, 354 F. Supp. 2d 1032, 1039 (E.D. Mo. 2004).

Defendants have made no factual allegations demonstrating that there was ever a valid contract in existence that required Mr. Icke to make any payments whatsoever to Mr. Adams. In fact, they admitted that Mr. Icke and Mr. Adams entered into an oral agreement whereby Mr. Adams would keep 25% of the net profits from sales of the Works and pay the remaining 75% of the net profits to Mr. Icke. It was Mr. Adams, not Mr. Icke, who was supposed to make payments under the terms of the Agreement. Defendants cannot demonstrate any issue of genuine material fact regarding the terms of the Agreement between the two men. Plaintiffs are entitled to summary judgment on this claim.

## 2. **Fraud**

In their second counterclaim, Defendants allege that Mr. Icke made fraudulent representations to Mr. Adams, to induce him to enter and invest in a partnership agreement. The requirements for proving fraudulent misrepresentation are:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the falsity or his ignorance of its truth; (5) the speaker's intent that his representation should be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the trust of the representation; (8) the hearer's right to rely thereon; (9) the hearer's consequent and proximately caused injury.

*Clark v. Olson*, 726 S.W.2d 718, 719 (Mo. 1987) (en banc).

Defendants have made no factual allegations demonstrating that Mr. Icke made any fraudulent representations to Mr. Adams, and never even set forth what representations they

assert Mr. Icke made to Mr. Adams. Nothing in the facts suggests that Mr. Icke was anything but truthful and straightforward with Mr. Adams with respect to their business relationship. Defendants have not demonstrated any genuine issue of material fact regarding Mr. Icke's alleged fraudulent representations and, thus, Plaintiffs are entitled to summary judgment on this claim.

**3.**      **Tortious Interference**

In their final counterclaim, Defendants allege that comments made by Mr. Icke on his website resulted in tortious interference with some of Mr. Adams's prospective business relationships. As previously discussed, under Missouri law, a claim of tortious interference with a contract or business expectancy requires proof of: "(1) a contract or business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 316 (Mo. 1993).

Defendants have made no factual allegations demonstrating that Mr. Adams had any kind of business expectancy with respect to Richard Hendricks, Glen Maxwell, or Craig Russell, the three authors mentioned in Defendants' Counterclaim. Further, even if they had established a business expectancy, they have made no factual allegations demonstrating that Plaintiffs were aware of the relationships. Defendants have not demonstrated that a genuine issue of material fact exists with respect to their claim for tortious interference. Thus, summary judgment is proper on this claim.

**V.**      **CONCLUSION**

Defendants have failed to establish that a genuine issue of material fact exists with respect to each of Plaintiffs' nine causes of action. Additionally, Defendants have failed to show that

there is sufficient evidence to enable a jury to return a verdict in their favor on their claims against Plaintiffs.  As such, Plaintiffs' Motion for Summary Judgment is granted.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment [doc. #60] is **GRANTED**.  Defendant Royal Adams, and any entity affiliated with or owned by him, including Defendant Bridge of Love, USA and Defendant Royal Personnel, Inc., has no right, title, or interest in or to Plaintiff David Icke's Works.  Defendants are strictly prohibited from engaging in any printing, distribution, sales, or other activities related to the Works.

Dated this <u>14th</u> Day of <u>November</u>, 2008.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE